**Delma USHER, et al., Plaintiffs, Appellees,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant, Appellant.**

No. 81–1181.

United States Court of Appeals, First Circuit.

Argued Sept. 18, 1981.

Decided Dec. 4, 1981.

Carlene V. McIntyre, Atty., Civ. Div., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., Stuart E. Schiffer, Acting

Asst. Atty. Gen., and Anthony J. Steinmeyer, Atty., Civ. Div., Dept. of Justice, Washington, D. C., were on brief, for defendant, appellant.

Mark S. Coven, Boston, Mass., with whom Howard Friedman, Washington, D. C., was on brief, for plaintiffs, appellees.

Before BOWNES and BREYER, Circuit Judges, and MURRAY,* Senior District Judge.

BREYER, Circuit Judge.

This case concerns the constitutionality of a Supplemental Security Income (SSI)[1] regulation that governs payments made to certain SSI recipients who rent living accommodations. The regulation provides that the Secretary will consider significant differences between the fair market value of the accommodation and a lower rental payment to be part of the SSI recipient's "income." The Secretary, in appropriate cases, will reduce the SSI payment accordingly. 20 C.F.R. § 416.1125(d) (1980). The district court found, 506 F.Supp. 1230, that this regulation violated the equal protection of the laws guaranteed by the federal constitution.[2] We disagree and reverse the judgment of the district court.

I.

SSI pays benefits to those blind, aged, or disabled applicants whose income and resources fall below certain specified levels. 42 U.S.C. §§ 1382, 1382a, 1382b. Essentially, the Secretary computes an SSI payment by deducting the claimant's income (as defined by statute and regulation)[3] from the SSI "standard payment." The difference between the two amounts is the level of benefits that the claimant will receive. Congress has provided that for purposes of making this calculation "income" is to include "both earned and unearned income, and . . . unearned income means all other income, including . . . support and maintenance furnished in cash or in kind. . . ." 42 U.S.C. § 1382a(a)(2)(A).[4]

The Secretary, pursuant to his general rulemaking authority,[5] has promulgated nu-

---

* Of the District of Massachusetts, sitting by designation.

1. Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* (1976).

2. The fifth amendment provides in pertinent part: "No person . . . shall . . . be deprived of life, liberty, or property without due process of law . . . ." The fourteenth amendment § 1 provides in pertinent part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of laws." The Supreme Court has held that classifications which violate the equal protection clause of the fourteenth amendment are also inconsistent with the due process requirement of the fifth amendment. *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974).

3. The statute and regulations generally provide for the inclusion of all earned and unearned income, 42 U.S.C. § 1382a(a), except for certain exclusions, 42 U.S.C. § 1382a(b). Excluded from income, for example, are certain federal or state assistance payments (other than SSI).

4. Section 1382a(a)(2)(A):
   (a) For the purposes of this subchapter, income means both earned and unearned income, and—

. . . .
   (2) unearned income means all other income, including—
   (A) Support and maintenance furnished in cash or in kind; except that in the case of any individual (and his eligible spouse, if any) living in another person's household and receiving support and maintenance in kind from such person, the dollar amounts otherwise applicable to such individual (and spouse) as specified in subsections (a) and (b) of section 1382 of this title shall be reduced by 33⅓ percent in lieu of including such support and maintenance in the unearned income of such individual (and spouse) as otherwise required by this subparagraph. . . .

5. Section 1383(d)(1) provides: "The provisions of section 407 of this title and subsections (a), (d), (e), and (f) of section 405 of this title shall apply with respect to this part to the same extent as they apply in the case of subchapter II of this chapter." 42 U.S.C. § 1383(d)(1).

Section 405(a) provides: "The Secretary shall have full power and authority to make rules and regulations and to establish procedures, not inconsistent with the provisions of this subchapter, which are necessary to carry out such provisions, and shall adopt reasonable and proper rules and regulations to regulate

merous regulations that define and describe the treatment accorded "income . . . in kind." Thus, income includes "the receipt by any individual of any property or service which he can apply either directly or by sale or conversion to meeting his basic needs for food, clothing, and shelter." 20 C.F.R. § 416.1102. Moreover, "support and maintenance in kind encompasses food, clothing, and shelter or any portion of any . . . such items." 20 C.F.R. § 416.1125(a). Further, "the value of in-kind support and maintenance refers to its current market value. . . ." *Id.* The regulations go on to define precisely how food or shelter received "in kind" is to be valued in a variety of situations. These situations include the case of a claimant who lives with his children or other family and receives food or housing. 20 C.F.R. § 416.1125(d)(1). They also include the circumstance at issue here—the receipt of assistance in the form of a reduced rental.

In the "reduced-rental" situation an SSI claimant typically lives in a house or apartment owned by a friend or relation and pays a rent below current market value. The relevant regulation treats this claimant by and large like a claimant who lives with his children.[6] It provides that when "an individual . . . lives in his own household, including a commercial establishment, and receives support and maintenance in kind . . .," the "maximum value of such support and maintenance is presumed to be [an amount equal roughly to slightly more than one-third of the standard SSI payment, but the presumption may be] . . . rebutted by the individual's establishing that the current market value of such support and maintenance, less any payment he makes therefor, is lower than the presumed value. . . ." 20 C.F.R. § 461.1125(d).[7] Under this regulation, the Secretary will count the difference between the fair market value of the accommodation and the amount the claimant pays for it as "in-kind" income. The Secretary will value this "income" as equal to no more than about one-third of the standard SSI payment; and the Secretary will value this "income" at a lesser amount if the claimant can show that it is worth less.

Plaintiffs receive, or have received, SSI benefits. They live in apartments owned

and provide for the nature and extent of proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder."

6. Even where the statute appears to warrant different treatment of reduced-rental claimants and claimants living with their children, the Secretary's regulations impose consistent treatment. Under 42 U.S.C. § 1382a(a)(2)(A) an SSI recipient who lives with his children and receives both food and shelter in kind has his benefits reduced by one-third of "the dollar amounts otherwise applicable to such individual. . . ." Rather than reducing the amounts by one-third of what a claimant would otherwise receive, one possible interpretation of the statute, the Secretary uses the standard payment amount as the basis for reduction of benefits for these claimants as well. 20 C.F.R. § 416.-1125(b). *Cf. Public Assistance Amendments of 1977,* Report of the Senate Committee on Finance on H.R. 7200, S. Rep. No. 95–573, 95th Cong., 1st Sess. 44 (1977).

7. 20 C.F.R. § 416.1125(d):
(d) *Valuation of support and maintenance for individuals in household situations.* When an eligible individual (or eligible spouse) lives in a household (i.e., is not in an institution), the reduction in the payment standard described in paragraph (b) of this section is inapplicable, and the provisions of §§ 416.1185 (see paragraph (c)(3)) and 416.-1190 do not apply, but any support and maintenance received in kind but not received in lieu of cash wages (see § 404.429(c) of this chapter) is unearned income. In such cases, effective with payment for December 1974, the maximum value of such support and maintenance is presumed to be that amount which, for an individual or a couple with no other income, would result in payment at two-thirds of the applicable payment standard; i.e., the value is presumed to be one-third of the payment standard, plus the exclusion applicable to unearned income. This presumption will be applied in determining the benefits payable unless it is rebutted by the individual's establishing that the current market value of such support and maintenance, less any payment he makes therefor, is lower than the presumed value. This rule will apply in the following circumstances:
. . . .
(2) When an eligible individual (or eligible spouse) lives in his own household, including a commercial establishment, and receives support and maintenance in kind.

by their children. They pay rent in amounts significantly less than fair market value.[8] In each case, the Secretary has reduced or terminated the plaintiffs' benefits in accordance with § 461.1125(d). Plaintiffs sued in the federal district court challenging these reductions. Passing upon cross-motions for summary judgment, the court found (1) that the regulation at issue is authorized by statute, but (2) that it unconstitutionally discriminates between those in plaintiffs' circumstances and others who either have formal leases or who live in federally subsidized housing. The Secretary has appealed. After considering the arguments of both the Secretary and the plaintiffs-appellees, we agree with the district court's holding on the first of these questions but disagree with its holding on the second.

**8.** Each of the plaintiffs filed an application for SSI benefits on which they were required to state the name of their landlord and their relationship, if any, to the landlord. The Secretary then phoned each of the relative-landlords and asked what rent they would charge for the leased apartment if they were renting to someone other than their parents. The Secretary accepted the value given by the relative-landlords in each case.

Thus, he found that plaintiff Usher was living in an apartment with a current market rental value of $200 per month for which she was paying $125 per month. The Secretary charged her with $75 unearned income in kind. Plaintiff Burgio was living in an apartment owned by her daughter for which she paid $100 per month. The current market value of the apartment was $150 per month, and the Secretary charged her with $50 unearned income in kind.

Plaintiff Dolan was living in an apartment owned by her daughter and son-in-law for which she paid $125 per month. The current market value of the apartment was determined to be $250 per month. Since Dolan could not rebut the presumed maximum value, she was charged with $83.13 of unearned income. The amount of the reduction ($83.13) was greater than the amount of benefits that she was receiving ($11), and her benefits were terminated.

Plaintiff DeFranco was living in an apartment owned by her daughter for which she paid $85 per month rent. The current market value of the apartment was determined to be $150 and DeFranco's benefits were reduced by $65, since the actual value of the unearned income that she received was less than the PMV.

## II

We begin with plaintiffs' claim that the Secretary is not authorized by Congress to consider a "reduced rental" as income received in kind. The argument is difficult to reconcile with the plain language of the statute, which instructs the Secretary to include as "unearned" income "*all* other income" and specifically refers to "support and maintenance furnished ... in kind." Plaintiffs, however, seek to circumvent this language as follows.

First, they point to a longstanding welfare policy that "only such net income as is *actually available* for current use on a regular basis" will be counted in determining a welfare claimant's "income." See 45 C.F.R. § 233.20(a)(iii)(C).[9] They state that it was Congress' intent that this policy be re-

**9.** Prior to October of 1972, federal assistance to the aged, blind and disabled was provided under cooperative federal-state program: Aid to the Aged, Blind, and Disabled, *Old* Subchapter XVI, 42 U.S.C. § 1381 *et seq.* (1970). That program, like many other programs under the Social Security Act, provided standards for states to follow in determining eligibility and benefits levels. As part of those standards, the program incorporated the "income and resources" clause of the Social Security Act. This clause, in virtually identical language, was found at § 1382(a)(8) of *Old* Subchapter XVI, and was and is found at 42 U.S.C. § 302(a)(10)(A) (Subchapter I: Grants to States for Old-Age Assistance and Medical Assistance for Aged), 602(a)(7) (Subchapter IV: Grants to States for Aid and Services to Needy Families with Children and for Child Welfare Services), 1202(a)(8) (Subchapter X: Grants to States for Aid to Blind), and 1352(a)(8) (Subchapter XIV: Grants to States for Aid to the Permanently and Totally Disabled). It is there mandated that the states in their assistance programs "shall, in determining need for such assistance, take into consideration any other income and resources" of the individual. The essence of the Secretary's longstanding policy in regard to the meaning of this clause is found in the interpreting regulation:

Only such net income as is actually available for current use on a regular basis will be

Plaintiff Reba Shaer and her husband Abraham (now deceased) were living in an apartment owned by their son and daughter-in-law for which they paid $200 per month rent. The current market value of the apartment was determined to be $250 per month. The Shaers' combined SSI benefits were reduced by $50.

flected in the statute and they argue that the income at issue here is not "actually available" because it cannot "readily be converted into cash."

Plaintiffs' argument is unsound, however, for income in kind can be "actually available" to a person without being convertible into cash. When one receives food, or clothing, or shelter, one receives an actual benefit whether or not there is a market in which one might sell that benefit. Indeed, in the very statute at issue, Congress referred to one form of "in-kind" income—the provision of shelter in the home of a relative—that is ordinarily *not* convertible into cash. 42 U.S.C. § 1382a(a)(2)(A). The Secretary has embodied the ordinary English meaning of the term "actually available" when he defines "income" as the receipt of "any property or services" which the recipi-

ent can "apply *either directly or* by sale or conversion" to meet "basic need for food, clothing, and shelter." 20 C.F.R. § 416.-1102. (Emphasis added.) In this case, plaintiffs received the income "directly."

None of the cases that plaintiffs cite suggests the contrary. Those cases involve, for example, (1) the question of whether the income of a "man in the house" without legal obligation to support a child shall be counted as part of the income of a child who does *not* receive it,[10] (2) the question of whether income for a welfare family shall be calculated by averaging *past* income despite the fact that their present income may well be lower,[11] and (3) the question of whether mortgaged assets shall be valued at *gross* market value without considering that the value of the equity in the assets

---

considered and only currently available resources will be considered.
45 C.F.R. § 233.20(a)(3)(ii)(c).

In October of 1972 *Old* Subchapter XVI of the Social Security Act was amended to "improve the effectiveness of the adult assistance programs under the Social Security Act" by "replacing the three present State-administered programs of assistance to the aged, blind, and disabled with one combined adult assistance program which would be federally administered by the Social Security Administration...." H.R.Rep.No.231, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4989, 4992. In this transition to the wholly federally funded SSI program, the exact phrasing of the "income and resources" clause as used throughout the Act was lost, but the general approach of considering "income and resources" was maintained. §§ 1381, 1382. The Secretary apparently agrees that the basic approach of the statute has not been changed; his regulations interpreting the new statute follow the same pattern as those interpreting the "income and resources" clause of the federal-state programs, providing that in determining the amount of unearned income, the amount "actually available" to the individual is to be considered. 20 C.F.R. § 416.1120. As we find that his interpretation of the statute in this regard is not unreasonable, we, of course, defer to it.

10. *Van Lare v. Hurley*, 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975) (New York regulation reducing pro rata the shelter allowance provided the recipients of AFDC benefits to the extent that there are nonpaying lodgers living in the household); *Lewis v. Martin*, 397 U.S.

552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970) (California rule providing that in computing payments to needy children who lived with their mother and stepfather or an "adult male person assuming the role of a spouse" (MARS) consideration should be given to the income of the MARS); and *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (Alabama statute denying AFDC payments to the children of a mother who "cohabits" in or outside of her home with any single or married able-bodied man). The Court reasoned that the income of the "man in the house" was not "available" to the child when there was neither a legal obligation for him to support the child nor contribution in fact. In the present case, there is contribution in fact to the SSI recipients.

11. *Barron v. Bellairs*, 496 F.2d 1187 (5th Cir. 1974) (Georgia "child support averaging policy" which provided that when the income of an AFDC family was unpredictable, its previous years income could be used to determine monthly income); and *Gutierrez v. Butz*, 415 F.Supp. 827 (D.D.C.1976) (regulation under the Food Stamp Program and applied to migrant workers, which calculated anticipated income for persons who had not yet received remunerative employment). In *Gutierrez*, the United States District Court for the District of Columbia compared the regulation to those challenged in the welfare cases and held that the anticipated income was not available to the migrant workers because it, like the "averaged" income, was hypothetical in nature and there was no assurance of the presence of a real economic benefit to the claimants.

was far lower.[12]  In all of these cases the courts rejected rules or practices that would have counted as income or assets benefits or funds that a welfare claimant did *not* receive.  On the other hand, when courts have considered the type of income at issue here, they have held that it is "actually available" to the SSI claimant because the claimant did receive an actual economic benefit.  *Kimmes v. Harris,* 647 F.2d 1028 (10th Cir. 1981), *rev'g Kimmes v. Califano,* 472 F.Supp. 474 (D.Colo.1979); *Antonioli v. Harris,* 624 F.2d 78 (9th Cir. 1980); *Styles v. Harris,* 503 F.Supp. 125 (D.Md.1980); and *Wynn v. Harris,* 494 F.Supp. 878 (W.D. Tenn.1980).[13]

We note that this is not a case in which the Secretary has been hypertechnical or stingy in his application of the regulation. He has not imputed benefits to the plaintiffs on the basis of fluctuating market values or the debatable opinions of expert real estate appraisers.  Four of the five plaintiffs have stipulated that the assessed values are correct, and each of the "fair market values," as determined by the Secretary, suggests to us that plaintiffs are receiving real and tangible benefits.

Plaintiffs' second argument is that Congress, by referring to some types of "in-kind" income in the statute, meant to exclude others from consideration.  In the statutory provision here at issue Congress, after stating that support and maintenance furnished in cash or kind would be included in income, wrote: *"except that in the case of any individual . . . living in another person's household* and receiving support and maintenance in kind . . . the dollar amounts otherwise applicable . . . shall be reduced by 33⅓ percent. . . ."  42 U.S.C. § 1382a(a)(2)(A).  (Emphasis added.)  The language quoted, however, does not purport to define all "in-kind" income.  To the contrary, by using the words "except in the case of," the statute specifically suggests an awareness that other types of "in-kind" income exist.  Moreover, subsequent Congresses have confirmed this understanding. In 1974, even before the regulation here at issue was promulgated, a House Conference Report on an amendment to the SSI statute stated:

> Under the SSI program for the aged, blind and disabled, *all forms of income— including room and board furnished for*

---

12. *National . Welfare Rights Organization v. Mathews,* 533 F.2d 637 (D.C.Cir.1976) (HEW regulation stating that the value of resources shall be their gross market value without regard to encumbrances); and *Green v. Barnes,* 485 F.2d 242 (10th Cir. 1973) (Oklahoma regulation providing that real estate owned and used as a shelter by the applicant is exempt from determining eligibility for assistance only to the extent that its market value is less than $10,000, applied without regard to the existence of mortgages).  These cases did not hold that assets must be able to be liquidated in order to be treated as "available," but rather that the economic realities must be observed and that the actual value of an asset to its owner can never be greater than his equity in the asset; he neither receives nor can receive economic benefit to the extent that the gross value exceeds his equity.

13. This broader definition of availability comports with the Supreme Court's recent opinion in *Schweiker v. Gray Panthers,* 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981).  In considering statutory language directing the Secretary to make Medicaid eligibility determinations (under another section of the SSI program) only on the basis of income "available to the applicant," 42 U.S.C. § 1396a(a)(17)(B), the

Supreme Court approved regulations which "deemed" spousal income to a claimant, noting that

> [a]vailable resources are different from those *in hand.*  We think that the requirement of availability refers to resources left to a *couple* after a spouse has deducted a sum on which to live.  It does not, as respondent argues, permit the State only to consider resources actually paid by the spouse to the applicant.

*Id.* at 48, 101 S.Ct. at 2642.  Here, owing to the legal relationship between husband and wife and the ensuing obligation of mutual support, the economic benefits of spousal income were sufficiently present to meet the availability requirement.  In the present case there is, of course, no legal duty of support running from child to parent, and were the Secretary presuming income to the parent based solely on the amount of income which his children received, we might have some difficulty in finding that the income was "available" to the parent.  The present case, however, does not involve such a presumption, but merely the proper classification and treatment of an actual economic benefit.

*less than cost*—are used to reduce the amount of benefits payable.

H.R.Conf.Rep.No.93–1407, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Ad.News 5992, 5995, 5996. (Emphasis added.) Following the promulgation of the regulations, a further House Report recognized without criticizing the Secretary's interpretation of the Act to require an imputation of income in the "reduced-rental" situation. H.R.Rep.No.94–1091, 94th Cong., 2d Sess. 21 (1976). In response, Congress created a specific exemption from this regulation for those who receive federal housing assistance. Housing Authorization Act of 1976, Pub.L. 94–375 § 2(h), 90 Stat. 1067, 1068 (1976). Yet in that same year § 1382a(a)(2)(A) itself was twice amended and the Secretary's interpretation of countable income was left undisturbed. Pub.L. 94–331, § 4(a), 90 Stat. 781 (June 30, 1976); Pub.L. 94–455, Title XXI, § 2125, 90 Stat. 1920 (October 4, 1976). Finally, in 1977 a Senate Report referred without criticism to the administrative practice, under the statute, of counting shelter received for less than fair market value as unearned income. "The Supplemental Security Income Program," Report of the Staff to the Senate Committee on Finance, 95th Cong., 1st Sess. 72–75 (1977).[14] Even if the statute were less clear, the fact that this consistent administrative interpretation has been specifically and repeatedly recognized without criticism by Congresses that have amended and revised the Act in other ways provides evidence that the Secretary's interpretation is correct. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–1762, 40 L.Ed.2d 134 (1974). Thus, we join the other courts which have considered this issue and hold that the regulation is authorized by statute.

## III

Plaintiffs argue that, if validly promulgated, the regulation (and the statute insofar as it authorizes the regulation) is unconstitutional. The Supreme Court has held that, in reviewing this type of challenge, we are to keep in mind that

the equal protection obligation imposed by the Due Process Clause of the Fifth Amendment is not an obligation to provide the best government possible. . . . Unless a statute employs a classification that is inherently invidious or that impinges on fundamental rights, areas in which the judiciary has a duty to intervene in the democratic process, this Court properly exercises only a limited review power over Congress, the appropriate representative body through which the public makes democratic choices among alternative solutions to social and economic problems. . . . At the minimum level, this Court consistently has required that legislation classify the persons it affects in a manner rationally related to legitimate governmental objectives.

*Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981).[15]

---

14. That Report specifically noted but found no fault with the agency decision to count shelter received for less than fair market value as unearned income. Interestingly enough, the one criticism made by the staff of the Senate Finance Committee was that there was no legal basis for limiting the counting of income in kind by establishing a presumed maximum value. "The Social Security Program," *supra*, at 72–73. Subsequently, in 1977, the Committee proposed an amendment to the Social Security Act which would have reduced the benefits which a recipient would otherwise receive by one-third whenever the recipient received regular in-kind contributions to support and maintenance. *See Public Assistance Amendments of 1977*, Report of the Senate Committee on Finance on H.R. 7200, S.Rep.No.95–573, 95th Cong., 1st Sess. 44 (1977). In this regard we

note that the plaintiffs suggest that the use of a PMV establishes a "budget" for housing needs in contradiction to congressional intent to establish an income maintenance rather than an individual budget system. While we do not believe that the use of a PMV is necessarily inconsistent with the flat-grant approach to income maintenance, plaintiffs have not asked us to consider the lawfulness of the PMV and there is no reason here to do so.

15. Plaintiffs argue that we should apply heightened scrutiny because (1) Congress never intended this discrimination, (2) the discrimination is caused by a mere administrative act and not by an Act of Congress, and (3) the regulation infringes on a fundamental freedom of personal choice in matters of living arrangements. We decline to use such heightened

We have examined plaintiffs' claim that this regulation arbitrarily discriminates between them and certain other groups. We reject that claim, for we believe that any difference in treatment is rationally related to reasonable and identifiable governmental objectives.

At the outset, it is important to understand that the rule applicable to those who receive reduced-rental benefits, is not, in any sense relevant here, "special." To the contrary, the rule applied to plaintiffs is one variation of a general policy that treats in a somewhat similar way all who receive benefits in the form of food, shelter, or clothing. Although there are some variations, the regulations set forth a basically similar approach to those who receive some part of, and those who receive all of, their food, clothing, or shelter from family, from friends, or from others.[16] In most of these instances, the regulations assume that the value of the items received is no greater than approximately one-third of the basic SSI allowance (plus an unearned income exclusion). This figure, known as the "presumed maximum value" (PMV) is presently about $83 per month. In other words, no more than $83 per month will be deducted from the SSI claimant's check whether his son provides him with a palace or a hovel. If the recipient has been given a hovel, however, he has the opportunity to show that it is worth less than the PMV, in which case his deduction will be reduced to the actual value.

It is important to understand this system, because the PMV, together with a low level of benefits and the varying degrees of generosity among recipients' children, is responsible for many of the discrepancies to which plaintiffs point. Take, for example, the case of a woman who lives on her own and receives the maximum SSI payment of about $189 per month. If her children send her food and pay her rent she will have about $80 deducted from her payment and is left with about $110 per month for other items. If her son only pays for her apartment, she will receive that same $110 which must then be used to cover food as well. If her son owns an extra apartment worth, say, $200 per month, which he rents to her at $100 per month, she will be left with that same $110, which she now must use to cover not only food but also the $100 rental payments. All these differences and discrepancies flow, not from different treatment by the regulations, but rather from differences in the level of the children's generosity. And, once a PMV generosity level (of about $83 per month) is reached, the regulations do not take further generosity differences into account.

Thus, a son, for example, might invite his father to live rent-free in a separate house owned by the son, see Boone v. Califano, 459 F.Supp. 636 (E.D.Va.1978), to live rent-free in a separate house owned by the son provided that the father pay for taxes and maintenance, see Antonioli v. Harris, supra, to live rent-free in a trailer owned by the son if the father will pay for upkeep, see Kimmes v. Harris, supra, to live in an apartment owned by the son if the father will pay reduced rental, see Styles v. Harris, supra, or to live in the son's own household and receive either shelter or food. 20 C.F.R. § 416.1125(c)(1), (d)(1). In each case, the Secretary does the same thing: in effect he reduces the claimant's SSI benefits by an amount equal to the value of the benefit that he receives in in-kind income, but never by more than the PMV. Given the statute, this is not a harsh policy as administered. It basically encourages SSI claimants' children to make contributions of food and shelter by not counting those contributions once they exceed the PMV. Thus, given the need for fairly simple, administrable rules, a tendency for the regulations to err on the side of generosity, and a specific Congressional mandate to treat

scrutiny as we believe that any relevant differential treatment was the intended result of congressional, not merely administrative acts and that any effects on family relations are merely incidental.

**16.** See note 6 supra.

"support and maintenance received in kind" as income including, but not limited to, support of persons who live in their children's homes, 42 U.S.C. § 1382a(a)(2)(A), the types of benefit differences referred to would not support an equal protection violation.

The district court's finding of unconstitutionality, however, did not rest upon benefit anomalies, but rather upon two specific instances of differential treatment created when the regulation is applied in practice. The district court found the first instance of differential treatment to be the result of the practice of imputing "reduced-rental" income to claimants only when they do not have a formal lease. It was argued to the district court, and the district court was persuaded, that if the claimants here had simply entered into a formal lease arrangement with their children, the Secretary would have *presumed* that they were paying fair market value for their living accommodations. The district court found no basis for distinguishing in this way between those who do, and those who do not, have formal leases with their children.

To penalize plaintiffs simply because they do not have a written lease document memorializing their low rent would certainly raise a suspicion of arbitrary agency action. Yet, in our view, the district court's finding that such a distinction exists was a result of confusion as to the operation of the regulations below. During discovery, the Secretary answered an interrogatory about his practices by stating, "where the residence is rented under a formal lease arrangement (commercial), the amount of rent established in the lease equals the current market value (C.M. 12355(h)(2))." The plaintiffs and the district court evidently took this answer as a statement that the Secretary would not look behind any written lease to actual value.

The word "commercial" and the reference to the Claims Manual procedure, "(C.M. 12355(h)(2))," however, make it clear that the amount of rent specified in a lease is accepted as the current market value only when the rental property is "commercial,"

i.e., the lease was the result of arms-length bargaining. The existence of a lease by itself proves nothing, but is merely one factor which the Secretary uses to determine whether a property is indeed commercial. In his appellate briefs the Secretary clearly outlined the proper procedure and at oral argument counsel for the Secretary stated unequivocally that it is not and was not the Secretary's policy to make the existence of a lease dispositive as to the existence of reduced-rental income. Plaintiffs could point to nothing in the record (other than the ambiguous interrogatory) tending to show the contrary. Since we have been assured that the district court's view of the Secretary's policy is incorrect and since the record supports and does not contradict the Secretary's asserted policy, we find no instance of differential treatment in this regard and hence no violation of the Constitution.

The second instance of differential treatment that underlay the district court's decision is the discrepancy created by a 1976 amendment to the United States Housing Act, which provides low-income assistance known as "Section 8 housing." Congress noted in 1976 that the "income in kind" SSI provisions made Section 8 housing less attractive to SSI recipients. Congress passed an amendment that created a specific exemption from the "income in kind" calculation for those having federal housing assistance. It provided,

Notwithstanding any other provisions of law, the value of any assistance paid with respect to a dwelling unit ... [under this program] may not be considered as income ... for the purpose of determining ... the amount of the benefits payable to ... [an SSI recipient].

Housing Authorization Act of 1976, Pub.L. 94–375 § 2(h), 90 Stat. 1067, 1068 (1976). The House Report on the amendment explained that the Social Security Act required a reduction in the SSI payment to reflect the value of the shelter received under the government program.

This means that an SSI recipient residing in Section 8 housing will suffer a reduc-

tion in SSI payments of one-third and then be charged a rental fee of not more than 25% of his remaining income. No other group of low-income persons, on or off public assistance rolls, suffer this extreme cost for accepting Federal Housing assistance. Although SSI recipients are among the lowest of income levels and in greatest of need, they are effectively denied use of the Section 8 program because of this regulation. All others receiving Section 8 assistance pay rents not to exceed 25% of income.

H.R.Rep.No.94–1091, 94th Cong., 2d Sess. 21 (1976). Plaintiffs would now have us hold that this amendment, when taken together with the SSI "income in kind" provisions, creates an unconstitutional discrimination.

The answer to plaintiffs' claim is that the difference in treatment at issue here reflects a rational effort by Congress to achieve a legitimate legislative objective. As the House Report explicitly states, Congress feared that the "income in kind" provisions discouraged SSI recipients from taking advantage of Section 8 housing. Moreover, it felt that those provisions were unfair as between those Section 8 housing recipients who did receive SSI assistance and those Section 8 housing recipients who did not receive SSI assistance. Congress passed the exemption in order to make Section 8 housing more attractive to SSI recipients and to produce greater fairness as among all Section 8 housing recipients. We cannot say that this legislative judgment was unreasonable.

Of course, when viewed from the perspective of all SSI recipients, rather than from that of all Section 8 housing recipients, those who benefit from *both* programs appear to have a special advantage. But it was not irrational, given the Section 8 housing objectives, to create that advantage. As the Supreme Court stated in *Jefferson v. Hackney*, 406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972):

A legislature may address a problem 'one step at a time,' or even 'select one phase of a field and apply a remedy there, neglecting the other,' *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563] (1955). So long as its judgments are rational and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket. The very complexity of the problems suggest that there will be more than one constitutionally permissible method of solving them.

More importantly, there is no requirement that all, or several, government programs, when viewed as a totality, must operate so as to create a completely fair or rational distribution of their total package of benefits among all who arguably suffer from equivalent need. Given the vast number of different government programs, with varying definitions of need and page after page of accompanying, program-specific rules and regulations, any "rational total net result" requirement would interfere with congressional efforts to distribute limited resources to those whom it judges to be particularly in need. If Congress cannot constitutionally offer intended beneficiaries of Program A any special advantage unless it also offers it to those who are outside Program A, it might simply choose not to offer the special benefit—a result that would work to no one's advantage.

Consider, for example, the present case. Plaintiffs are arguing for inter-program equality of benefits on the ground that SSI recipients within a Section 8 housing program and those outside Section 8 have equivalent needs. If we accepted plaintiffs' view, Congress could enact an "in-kind" income exemption for "Section 8/SSI" recipients, only if it extended the exemption to all SSI recipients. But, if Congress had been forced to include all SSI recipients in any "in-kind" income exemption for a few, it might well have decided to grant no one an exemption.[17] As a result, Congress

17. Indeed we doubt that were we to find an unconstitutional discrimination between Section 8 recipients and plaintiffs, the proper response would be to strike down this regulation. A decision striking down the exclusion for Section 8 assistance would be just as productive of

would not only act less generously, but it would also be unable to deal with the unfairness that it perceived when it compared "Section 8/SSI" recipients with other *Section 8 housing* recipients. We find nothing in the Constitution that requires placing Congress in any such straightjacket.

In sum, we believe that where two different Congressional programs are at issue and where there is no question of "suspect" categories or interference with fundamental rights, Congress enjoys wide discretion to offer special benefits to some without offering them to all. We believe that it is rational for Congress to have offered such a special benefit to SSI recipients who also receive federal housing assistance. Thus, we find no violation of constitutionally protected "equal protection" rights.

*Reversed.*

equality and might well be more consistent with Congress' likely intent. *See generally* G. Calabresi, *A Common Law for the Age of Statutes* (forthcoming, January 1982).