Cornelius CONSTANCE, Plaintiff, Appellee,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee,

Alexander E. Sharp, etc., Defendant, Appellant.

Cornelius CONSTANCE, Plaintiff, Appellee,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellant.

Nos. 81–1322, 81–1323.

United States Court of Appeals, First Circuit.

Argued Oct. 9, 1981.

Decided March 5, 1982.

fore reverse a district court holding to the contrary.

## I

The appellee, Cornelius Constance, first received disability benefits in 1973 under a state program of "Aid to the Permanently and Totally Disabled." Under this "APTD" program, Constance's wife, Sydonia, was not entitled to receive assistance in her own right. But because she lived with Constance and was "essential" to his care and well-being, Constance's benefits included an "essential person" allowance on her account.

On January 1, 1974, the APTD program in Massachusetts and all similar programs of assistance to the aged, blind and disabled throughout the nation were replaced by the federal Supplemental Security Income, or "SSI" program. Pub.L. No. 92–603, 86 Stat. 1465 (codified at 42 U.S.C. §§ 1381 *et seq.* (1974)). *See generally Schweiker v. Gray Panthers*, 453 U.S. 34, 38, 101 S.Ct. 2633, 2637, 69 L.Ed.2d 460 (1981); *Reichenthal v. Harris*, 492 F.Supp. 637, 639 (E.D.N.Y.1980). For purposes of this case, it is important to understand four aspects of the SSI program. First, SSI was designed to "federalize" assistance to the disabled. Prior to SSI, the disabled poor received state payments; and the federal government reimbursed the states for one-half the benefits provided. Under SSI, however, the federal government sends directly to the individual a check, which for the most part represents a federal payment but which may also represent a state contribution for which the federal government is reimbursed. SSI also aimed at administrative simplicity; eligibility is based on nationwide income and resource tests; federal payments are nationally uniform.

Second, SSI encourages states to make additional, *"optional"* payments by excluding such payments from its definition of (disqualifying) income, thus ensuring that an additional dollar of state payment will not lead to a dollar's reduction in the feder-

Stephen S. Ostrach, Asst. Atty. Gen., Government Bureau, Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for the State appellant.

Larry K. Banks, Atty., Social Security Division, Dept. of Health and Human Services, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., and Thomas S. Martin, Acting Asst. Atty. Gen., Washington, D. C., were on brief, for appellant Secretary of Health and Human Services.

Peter Benjamin, Springfield, Mass., with whom Kenneth P. Neiman, Holyoke, Mass., was on brief, for appellee.

Before CAMPBELL and BREYER, Circuit Judges and WYZANSKI,* Senior District Judge.

BREYER, Circuit Judge.

This case raises the question of whether a federal statute providing a special federal payment to certain disabled persons (those with "essential persons") permits the state to reduce correspondingly its own state payments dollar for dollar. We find that the federal statute was specifically intended to give the states this authority, and we there-

* Of the District of Massachusetts, sitting by designation.

al payment. 42 U.S.C. § 1382e(a). SSI will administer these optional state payments if the state wishes, sending the state payment to the recipient as part of the SSI check. Apparently most, if not all, states determine the amount of additional state contribution in the same way as Massachusetts. They set "ceiling" figures for recipients in different categories, and then provide for each recipient the difference between the federal contribution and the ceiling. If there are other states following a different system—say, a system under which the state contributes a fixed additional sum of dollars to the federal payment—we have been unable to find them. *See Staff of Senate Comm. on Finance, 95th Cong., 1st Sess., Report on the Supplemental Security Income Program* 247–54 (Comm. Print 1977) (Appendix Tables 8 & 9). The exact details of the state payment system are worked out in an agreement between the state and the federal Social Security Administration ("SSA"), subject to state law and to constraints contained in the Social Security Act and SSA regulations. *See* 42 U.S.C. § 1382e(a) and (b). For example, for ease of administration, SSA limits the number of "ceiling" categories that a state may set.[1] *See* 20 C.F.R. §§ 416.2020 and 416.2030.

Third, SSI contains a *"mandatory"* state supplementation provision. Pub.L. No. 93–66, § 212, as amended (printed in the notes following 42 U.S.C.A. § 1382). This provision was enacted in response to fears that many welfare recipients would be worse off in 1974 under SSI than they were in 1973 under the prior state programs. These fears led Congress to "grandfather" state welfare beneficiaries into SSI at their old payment levels. It did this by requiring the states to provide supplements to the grandfathered beneficiaries sufficient to ensure that their overall income never fell below the amount they received before SSI.

Fourth, the SSI legislation includes an uncodified "essential person" provision. Pub.L. No. 93–66, § 211, as amended (printed in the notes following 42 U.S.C.A. § 1382). This provision applies to any SSI beneficiary who (i) lives with an "essential" person (*e.g.*, a wife not eligible for SSI herself), and (ii) who actually received an allowance on account of that person under a state program of aid in 1973 prior to SSI.[2] It protects the benefit levels of these particular recipients by providing a special federal supplement about equal to what the states had paid before federalization.

Constance received payments under this federal-state system in 1974 and 1975. In May 1975, however, the SSA came to believe that it was overpaying Constance for reasons (related to his receipt of other income) not pertinent here. *See* note 3, *infra.* An SSA hearing examiner confirmed that Constance received certain overpayments, but he also believed that Constance had been underpaid under Massachusetts' program of "optional supplementation." Simplifying the figures somewhat and focusing on the representative month of January 1974, Constance received a basic SSI grant of $140 per month. In addition, he received a federal "essential person" allowance of $70 per month bringing his total federal payment up to $210 per month.[3] Massachu-

---

1. Appellants argue that this is why Massachusetts has no separate category establishing a special ceiling for recipients with "essential persons."

2. Although the SSI program generally does not provide extra payments for those who are not independently eligible for benefits, before federalization some states gave more assistance to those living with such "essential persons" than to those who lived alone. *See* discussion p. 991, *supra.*

3. The "other income" that Constance was receiving consisted of disability benefits received under a different title of the Social Security Act. The actual payments made to Constance consisted of $215 in these disability benefits, $210 in SSI, and roughly $5 in "optional supplementation." All but $20 of the disability benefits—that is, $195—should have been (but was not) offset against the amounts paid out under SSI. Thus, had the federal government been aware that Constance was receiving both disability benefits and SSI, it should have paid him only $15 in SSI (the $210 entitlement less the $195 of "includible" disability benefits). With these complications worked back into the case, Massachusetts still contends that it was only required to pay Constance an additional

setts supplemented this payment by roughly $5, because that was the amount needed to reach the income "ceiling" of $215 appropriate to Constance's "optional supplementation" category.[4] If the federal government had not given Constance the $70 "essential person" supplement, Constance would still have been entitled to a total payment of $215 per month, and Massachusetts would have contributed $75 rather than just $5.

The hearing examiner concluded that this was improper. In his view, by subtracting the federal "essential person" payment from the amount it would otherwise contribute, Massachusetts effectively deprived Constance of the "essential person" benefit. He therefore recommended that Massachu-

setts be required to raise its supplementary payments to Constance by the amount of his "essential person" allowance, so that Constance would receive the same $75 state supplement as (and end up $70 better off than) individuals who did not receive federal "essential person" payments.

The Appeals Council of the SSA refused to follow the hearing examiner on this point, noting that it was aware of no statute or legal authority that compelled such additional payments. On review, the district court agreed with the hearing examiner and reversed the Appeals Council, finding the relevant legal authority in the federal "essential person" statute.[5] The SSA and the Commonwealth of Massachusetts[6]

---

$5; Constance claims he was entitled to an additional $75.

4. Prior to SSI, Massachusetts had provided special payments for welfare beneficiaries living with "essential persons." Its "optional supplementation" program, however, did not include a category for such persons. Constance therefore fell simply into the category of "disabled eligible individual[s]" who lived either alone or with ineligible dependents. See 1973 Mass. Acts ch. 1210, § 35, codified as a note to Mass.Gen. Laws Ann. ch. 118A, § 1.

5. The "essential person" statute, Pub.L. No. 93–66, § 211, as amended (printed in the notes to 42 U.S.C.A. § 1382), provides that:

(a)(1) In determining (for purposes of title XVI of the Social Security Act [the SSI statute], as in effect after December 1973) the eligibility for and the amount of the supplemental security income benefit payable to any qualified individual (as defined in subsection (b)), with respect to any period for which such individual has in his home an essential person (as defined in subsection (c))—

(A) the dollar amounts specified in subsection (a)(1)(A) and (2)(A), and subsection (b)(1) and (2), of section 1611 of such Act [i.e., 42 U.S.C. § 1382], shall each be increased by $876 for each such essential person,
....

(b) For purposes of this section, an individual shall be a 'qualified individual' only if—

(1) for the month of December 1973 such individual was a recipient of aid or assistance under a State plan approved under title I, X, XIV, or XVI of the Social Security Act,

(2) in determining the need of such individual for such aid or assistance for such month under such State plan, there were taken into

account the needs of a person (other than such individual) who—

(A) was living in the home of such individual, and

(B) was not eligible (in his or her own right) for aid or assistance under such State plan for such month.

(c) The term 'essential person', when used in connection with any qualified individual, means a person who—

(1) for the month of December 1973 was a person (described in subsection (b)(2)) whose needs were taken into account in determining the need of such individual for aid or assistance under a State plan referred to in subsection (b)(1) as such State plan was in effect for June 1973,

(2) lives in the home of such individual,

(3) is not eligible (in his or her own right) for supplemental security income benefits under title XVI of the Social Security Act (as in effect after December 1973), and

(4) is not the eligible spouse (as that term is used in such title XVI) of such individual or any other individual.

If for any month after December 1973 any person fails to meet the criteria specified in paragraph (2), (3), or (4) of the preceding sentence, such person shall not, for such month or any month thereafter be considered to be an essential person.

6. In the district court, Constance sued both the Secretary of HEW and the Massachusetts Commissioner of Public Welfare. At oral argument on this appeal, we expressed doubt as to whether the Commissioner was a proper party in the district court, for he was not involved in the original administrative proceedings and no order had been entered in those proceedings either in his favor or against him. We are now satisfied, however, that the Commissioner was

appeal from the district court's decision.[7] We reverse.

## II

■ Although we disagree with the district court's ultimate decision on the issue in this case, we believe that the court correctly recognized that the "essential person" statute lies at the heart of Constance's claim. As far as we are aware, that statute aside,

the federal government complied with all relevant laws by providing Constance with his basic payment plus "essential person" allowance; and Massachusetts complied with all other federal statutes, with state law,[8] and with its federal-state SSI agreement[9] when it created its "ceiling" system, when it created categories,[10] and when it paid Constance an amount sufficient to reach the ceiling in his category.[11] Rather,

a proper party. The Commissioner is the official responsible for the "optional supplementation" program in Massachusetts. Since Constance claims the program violates federal law, it was proper to join the Commissioner as a defendant (as Constance did) pursuant to 42 U.S.C. § 1983. *See Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

**7.** We also expressed concern at oral argument about whether this case presents a "final decision of the Secretary"—an essential prerequisite to judicial review under 42 U.S.C. § 405(g). Since the legal issue before us bears primarily on the size of certain overpayments made to Constance, *see* note 3, *supra*, and since the Appeals Council remanded Constance's case for a determination of whether, in any event, the Secretary should waive his right to collect the overpayments, Constance may suffer no loss of payment regardless of the correctness of the Appeals Council ruling. Appellant points out, however, that the Council also declared its decision to be authoritative in determining Constance's future "eligibility for SSI and mandatory state supplementation." Since the record reveals that other outside income is likely to have destroyed Constance's eligibility for federal SSI payments *in any event* after 1975, we are uncertain whether this declaration of future rights creates a controversy of sufficient concreteness to avoid the Constitution's prohibition against the federal courts issuing advisory opinions. *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *United Public Workers v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947); *Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911); *Hayburn's Case*, 2 Dall. 408, 1 L.Ed. 436 (1792). *Cf. Doremus v. Board of Education*, 342 U.S. 429, 434–35, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952). We are nonetheless prepared to find sufficient power to decide this case under Article III and the relevant statute in the fact that Constance's potential right to future state optional payments may be directly and realistically affected. *See* 42 U.S.C. § 1382e(a). Yet, noting that all sides have conceded, rather than argued, this court's power to review, and that the record is far from clear, we do not give this opinion precedential effect on the reviewability question.

**8.** Under the laws establishing Massachusetts' "optional supplementation" program,

> state supplementary payments . . . shall be at levels sufficient so that when combined with federal supplemental security income they shall amount to at least [specified monthly amounts for each category].

1973 Mass. Acts ch. 1210, § 35, *supra*, note 4. Because "essential person" payments are a form of SSI, *see* Pub.L. No. 93–66, § 211(a)(1), *supra*, note 5, under the state statute they reduce the amount of supplementation their recipients would otherwise be paid.

**9.** The federal-state SSI agreement, which governs the details of the federal administration of Massachusetts' program, *see* 42 U.S.C. § 1382e, explicitly provides that "the payment levels [according to which the Secretary of HEW is to make payments on behalf of the Commonwealth] . . . include the basic Federal payment." Article I of the Agreement itself, which defines terms used throughout the Agreement, provides that:

> The term 'basic Federal payment' means the monthly payment required by . . . [among other statutory provisions] section 211 of P.L. 93–66 [the "essential person" provision]. . . .

**10.** We see nothing unreasonable in Massachusetts deciding not to recognize "essential persons" as a separate category, particularly given the SSA policy of limiting the number of separate categories that states may create. *See* p. 3, *supra*. If a system is to be administratively workable, not every difference among recipients can be recognized through a different category. We therefore reject Constance's "equal protection" argument. *See Schweiker v. Wilson*, 450 U.S. 221, 230, 234–35, 101 S.Ct. 1074, 1080, 1082–83, 67 L.Ed.2d 186 (1981); *Jefferson v. Hackney*, 406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972); *Usher v. Schweiker*, 666 F.2d 652, 661 (1st Cir. 1981).

**11.** Constance also argues that the federal statute providing for optional state supplementary payments forbids Massachusetts to reduce its optional payment *pro tanto*. The statute requires state supplementary payments to "be

here, the issue is whether the federal "essential person" provision, in *explicitly* requiring the federal government to pay an "essential person" allowance, *implicitly* requires the states so to structure their optional supplementation programs that this allowance is effectively passed through to the SSI recipient.

For several reasons, we do not believe that the "essential person" provision imposes any such implicit obligation upon the states.

Initially, the Social Security Administration argues that this provision was intended to do no more than provide "grandfather-type" protection of payment levels for a particular group of recipients—those who received "essential person" benefits in 1973. Congress's concern arose out of fear that federalization of the state benefit programs would lead some recipients (including many receiving state "essential person" benefits) to receive lower benefits in 1974 than they had in 1973. This concern can be met by interpreting the statute to make certain that this group receives at least as much in 1974 as they received in 1973. But there is no reason to go further. *See* S.Rep.No. 93–249, 93d Cong., 1st Sess. 24 (1973), U.S. Code Cong. & Admin.News. 1973 p. 1507; *The Need for Protecting Aged, Blind and Disabled Welfare Recipients from Suffering a Reduction in Benefits When the New Federal Supplemental Security Income Program Becomes Effective in January 1974: Hearing Before the Senate Comm. on Finance*, 93d Cong., 1st Sess. 9 (1973) [herein-

after "*Grandfather Hearings*"] (statement of Secretary Weinberger). The SSA adds that a "pass through" requirement would seriously undermine state ceiling-type supplementary programs, for it would permanently guarantee 1973 "essential person" recipients, say, $70 per month more than others in their category (including beneficiaries with essential persons who did not become such until 1974!)—hardly a uniform or fair system of administration. The "ceiling" system has long been in use and has apparently been recognized as appropriate by those regularly at work on these problems in Congress. *See Staff of Senate Comm. on Finance, 95th Cong., 1st Sess., Report on the Supplemental Security Income Program 247–54 (Comm. Print 1977)* (Appendix Tables 8 & 9). And the SSA points out that by its language the provision is addressed to federal payments, not to state supplements. *See* note 5, *supra.*

■ In considering these arguments we are obliged to respect an agency's interpretation of its own governing statutes. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 84 L.Ed. 124 (1944). The extent of that respect, or deference, on a question of law is a function of Congress's intent on the subject as revealed in the particular statutory scheme at issue. *Social Security Board v. Nierotko*, 327 U.S. 358, 368–69, 66 S.Ct. 637, 642, 643, 90 L.Ed. 718 (1946). Where Congress is silent, common sense suggests that the less important the question of law, the more interstitial its

---

made ... to *all* individuals residing in [the] state ... who are receiving [SSI] benefits...." 42 U.S.C. § 1382e(b)(1) (emphasis added). He claims that this language requires a state to pay the *same* optional benefit to each person within any single state category. On its face, this statute deals with eligibility, not the amount of payment; and, it provides a simple eligibility rule: a recipient eligible for federal benefits is eligible for state supplementary benefits. There is no reason to believe that Congress wished to say more. To read this statute as Constance suggests would effectively outlaw the "ceiling" supplementation system, which is used widely, perhaps universally. *See, e.g.,* N.Y. Social Services Law § 209(4) (McKinney); Calif.Ann. Welf. & Inst. Code § 12200 (West 1980). Such an interpretation would strain the

statute's language, challenge the settled course of its administration, and depart from the many indications of congressional intent to leave the states maximum freedom to decide whether, how, and to what extent, to supplement. *See, e.g.,* H.R. Rep.No. 92–231, 92d Cong., 1st Sess. 199 (1971), *reprinted in* [1972] U.S.Code Cong. & Admin.News 4989, 5133, 5185.

Constance also claims that Massachusetts is violating a number of federal administrative regulations, *e.g.,* 20 C.F.R. §§ 416.2010(a) and 416.2030. All of the objections based on these regulations, however, either reassert or presume that states may not adopt programs of supplementation that guarantee overall levels of income rather than absolute amounts of supplementation. As already indicated, that is a proposition with which we do not agree.

character, the more closely related it is to the everyday administration of the statute and to the agency's administrative or substantive expertise, the less likely it is that Congress wished the courts to remain indifferent to the agency's views. Thus, in a case such as this one, where the legal issue (involving only "grandfathered" 1973 recipients), is minor and interstitial, yet imbued with administrative implications, we pay heed to the agency's warning that the district court's judgment reflects neither the statute's language nor its intent and threatens the creation of an administrative anomaly. *See Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1979); *Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975). *See also Federal Election Commission v. Democratic Senatorial Campaign Committee,* —— U.S. ——, —— 102 S.Ct. 38, 41, 70 L.Ed.2d 23 (1981) and cases cited therein.

Constance claims, however, that there is a major flaw in SSA's argument. He states that a simple "grandfather guarantee" could not be the only purpose of the "essential person" provision, for the "mandatory supplementation" provisions, described at p. 992, *supra,* are sufficient to do that. They guarantee 1973 benefit levels to *all* beneficiaries; consequently, the "essential person" provision is redundant unless it seeks some different goal. We have examined the legislative history of the provision with the argument in mind. Our examination convinces us that the provision does indeed have another purpose—but not the "pass through" purpose for which Constance argues.

When Congress realized in 1973 that its new social security program might leave some recipients—including many with "essential persons"—with lower dollar benefits in 1974 than they had previously received, it

had to answer two questions. First, it had to decide whether to guarantee their prior benefit levels. Second, it had to decide, if so, who should pay the cost of the guarantee, the state or the federal government. The "mandatory supplementation" provisions and the "essential person" provisions overlap and are duplicative in their positive answer to question one.[12] But, they differ markedly in their answer to question two. The "mandatory supplementation" provisions require the *states* to bear the additional cost of the guarantee. The "essential person" provision, however, requires the *federal* government to bear the cost of the guarantee insofar as it applies to those with "essential persons"—an important subclass of the guarantee's beneficiaries. Together, the provisions have the effect of guaranteeing all recipients their 1973 level of benefits, with the federal government making up the difference for "essential person" recipients and the state governments making up the difference for all others.

That precisely this result was the intent of those who fashioned the statutory scheme is evident from the debate between Caspar Weinberger (then Secretary of HEW) and Russell Long (then Chairman of the Senate Finance Committee). Weinberger argued that SSI's federal assumption of welfare costs would enable the states to spend elsewhere a great deal of money previously used to provide welfare benefits. The money released by SSI was more than sufficient for the states to "grandfather," or hold harmless, those recipients whose benefits would otherwise be reduced upon conversion to SSI. He claimed, therefore, that the Administration

would be very much opposed to [grandfathering recipients on state rolls in December 1973 at their old benefit levels at federal expense]. It would cost an additional $900 million of Federal Moneys

---

**12.** Strictly speaking, the "essential person" provision does not simply protect prior recipients of "essential person" payments from a loss in benefits. For one thing, it provides all such recipients the same federal benefit regardless of whether they received a larger or smaller "essential person" payment from their state

before SSI. For another thing, it guarantees simply receipt of an "essential person" allowance and *not* maintenance of some prior, *overall* level of income. For *that* guarantee, recipients must look to the states. *See* Pub.L.No. 93–66, § 212(a)(3)(B)(i), as amended (printed in the notes to 42 U.S.C.A. § 1382).

just to relieve states of sharing the cost of assistance to the people now on their caseloads.

*Grandfather Hearings, supra,* p. 11, at 6 (statement of Caspar Weinberger). Senator Long, however, was not convinced. He said that he "had gained the impression" that the SSI legislation "had included a sort of grandfather approach in which at the Federal level we were going to assure that no one received a cut...." *Id.* at 7 (statement of Senator Long). "I gained the impression," he continued, "that we were doing more to help the States and the aged than we in fact did ...." *Id.* And finally, he added:

> We give the impression that the partnership is over with, that the Federal Government is going to take this program over and pay for it and, having done that, we say, well, a lot of people would receive a reduction, and so to avoid that, we will call upon the States to supplement.
>
> Now it would seem to me, rather than try to call upon 50 States to supplement, it would be better at this point for the Federal Government simply to find a way to take care of the difference.

*Id.* at 12.

The resulting provisions have all the earmarks of a compromise designed to deal with this problem. The "essential person" statute throws upon the federal government the cost of the anti-reduction guarantee as to the roughly 125,000 prior recipients with "essential persons." *See Grandfather Hearings, supra* p. 11, at 9 (statement of Caspar Weinberger); S.Rep.No. 93–249, 93d Cong., 1st Sess. 24 (1973). The "mandatory supplementation" statute throws the cost of the remainder of that guarantee upon the states.

It may well be true, as Constance suggests, that the recipient does not care who pays for his "essential person" allowance. But, the matter is important to both federal and state governments. The "essential person" provision may not in fact provide Constance with more money than he would receive under the "mandatory supplement" provision alone, but that does not deprive the "essential person" provision of meaning or purpose.

Several other factors support this interpretation of the provision. For one thing, it explains why the provision was considered of insufficient general importance to codify and why its language is addressed to the federal government, not the states. This interpretation also explains why Congress did not specifically say that the states should not use the increased federal spending as an excuse to cut their own. *Cf.* 42 U.S.C. § 1383g; *Reichenthal v. Harris,* 492 F.Supp. at 640. Finally, this interpretation explains why the provision does not apply to *all* SSI recipients with essential persons. Rather, it applies only to those who received "essential person" payments in 1973, giving nothing to other SSI recipients who (like Constance) live with and must support someone essential to their care, but who (unlike Constance) did not receive an "essential person" payment under a state welfare program before January 1, 1974.[13] Had Congress seen the provision as anything more than a guarantee of past benefit levels to specific individuals—if, for example, it was seeking to fulfill some larger purpose by recognizing the greater need of those with essential persons—it is difficult to see why it would have restricted the provision to those who had received an "essential person" allowance from a state program in 1973.

For these reasons, we conclude that the "essential person" provision means no more than what it says: The federal government, not the state, must provide "essential person" allowances to those who received such allowances in 1973 and who continue to meet certain other conditions. And, states, when they provide optional supplementary payments to their citizens, may take those allowances into account.

*Reversed.*

---

13. In fact, the statute does not even provide benefits to individuals whose "essential person" even temporarily sheds that status (*e.g.,* by leaving but later returning to the individual's home). *See* Pub.L.No. 93–66, § 211(c), *supra,* note 5.