**COMMONWEALTH OF MASSACHU-SETTS, DEPARTMENT OF EDUCATION, Petitioner,**

v.

**UNITED STATES DEPARTMENT OF EDUCATION, Respondent.**

No. 87–1385.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1987.

Decided Jan. 27, 1988.

Jane S. Schacter, Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for petitioner.

Ronald B. Petracca with whom Wendell L. Willkie, General Counsel, Washington, D.C., and Rebecca April Fitch, were on brief, for respondent.

Before BOWNES and SELYA,
Circuit Judges, and CAFFREY,* Senior
District Judge.

* Of the District of Massachusetts, sitting by desig-

SELYA, Circuit Judge.

This proceeding is the culmination of a struggle between state and federal sovereigns, fought against the backdrop of Part B of the Education of the Handicapped Act, 20 U.S.C. § 1400 et seq., §§ 1411-1420 ("EHA-B"). The protagonists are the Massachusetts Department of Education (hereinafter sometimes "MassEd" or "the Commonwealth") and the United States Department of Education ("FedEd"). After much preliminary skirmishing, FedEd's chief executive officer, the Secretary of Education ("Secretary"), determined that MassEd had impermissibly retained and reallocated certain EHA-B subsidies. The Commonwealth, hotly disputing this finding, brought the instant petition pursuant to 20 U.S.C. § 1234d(b) to review the Secretary's final decision.

We begin our narrative by exploring the statutory mosaic and examining the pertinent facts. We then rehearse the travel of the matter, frame the principal issue, and attempt to decipher the Vitruvian scroll which this appeal features.

## I. THE STATUTORY SCHEME

The EHA-B establishes an entitlement program aimed at providing special education and related services to handicapped children. 20 U.S.C. § 1400(c). Congress appropriates funds annually and the Secretary allocates them to the states on a per capita basis. 20 U.S.C. § 1411(a). A state receives these federal grants in its capacity as a state educational agency ("SEA"). 20 U.S.C. § 1401(7). In order to be eligible for funding, each SEA must formulate and submit a plan that complies with federal statutory requirements, procedural and substantive. 20 U.S.C. § 1413(a). One such requirement is that a minimum of 75% of the federal funds which an SEA receives be distributed to qualified local educational authorities ("LEAs") for designated uses permitted under the EHA-B. 20 U.S.C. § 1411(c). The SEA can retain the balance of its EHA-B award to be utilized in administration of the grant program and pro-

nation.

vision of direct and support services to handicapped children. *Id.*

On a state-by-state basis, each LEA is entitled to share in EHA–B grants proportionate to the number of handicapped children which it serves (as contrasted to the aggregate number of handicapped children, statewide). 20 U.S.C. § 1411(d). But, the funds do not trickle down automatically. In order to secure its ratable share, an LEA must lodge a subgrant application with the SEA, detailing the specific projects which it proposes to undertake. 20 U.S.C. § 1414. The SEA has the right to approve or disapprove each such project. *Id. See also* 34 C.F.R. § 76.301 (1987). If an LEA is unable to formulate an acceptable plan, its allocable portion of the funds is either swallowed by the SEA (if the latter can use the extra money without exceeding the 25% cap, *see* 20 U.S.C. § 1411(c)) or added to the distributable shares of other (less than fully-funded) LEAs. Once made, subgrants must be expended by an LEA for permitted purposes in a timely fashion. Elsewise, they are recouped by the state agency. By the same token, if an SEA fails seasonably to obligate any EHA–B funds—including but not limited to funds recaptured from LEAs—they escheat to the Secretary. *See* 34 C.F.R. § 76.705(b) (1987).

It is thus apparent that temporal constraints are part of the warp and woof of the EHA–B fabric. This brings us to a consideration of the Tydings Amendment, § 412(b)(1) of the General Education Provisions Act (GEPA), which reads in its entirety:

Notwithstanding any other provision of law, unless enacted in specific limitation of the provisions of this subsection, any funds from appropriations to carry out any programs to which this chapter is applicable during any fiscal year, which are not obligated and expended by educational agencies or institutions prior to the beginning of the fiscal year succeeding the fiscal year for which such funds were appropriated shall remain available for obligation and expenditure by such agencies and institutions during such succeeding fiscal year.

20 U.S.C. § 1225(b)(1) (1982).

Although the Tydings Amendment is not a part of EHA–B proper, it is an important adjunct thereto. The federal fiscal year (FY) runs from October 1 through September 30 next following, and Congress often gears appropriations to this twelve month span. Before 1970, state and local educational agencies were required to obligate and spend EHA–B funds within the fiscal year in which the funds were appropriated. The Tydings Amendment, enacted in 1970, *see* P.L. 91–230, 84 Stat. 165 (1970), and later made permanent, *see* P.L. 95–561, 92 Stat. 2354 (1978), changed all that. It required a state (and its subgrantees in state-administered programs, like EHA–B) to complete the process of obligating funds by the end of the fiscal year succeeding the fiscal year for which the funds were appropriated. Moreover, as to the economics of EHA–B, the Tydings Amendment must be read in conjunction with § 411 of GEPA, 20 U.S.C. § 1223, which allowed appropriations for the subsequent fiscal year to be included in Congress' appropriations bill for the previous year. Because of this quirk, the Secretary oftentimes can make program funds available in advance of the fiscal year for which the funds are actually appropriated.

To illustrate, let us focus hypothetically on FY1981. Funds for that fiscal year would have been allocated by FedEd to the various SEAs in or about the summer of 1980, and would have had to be obligated by the particular state or local authorities no later than the end of FY1982, that is, by September 30, 1982. Thus, although FY1981 did not begin until October 1, 1980, EHA–B awards for FY1981 could be bestowed by, say, July 1, 1980. Thereafter, the recipient SEA could begin processing and approving subgrant applications. In so doing, the SEA would in effect be subgranting, as early as mid-1980, FY1981 funds—funds which did not have to be "obligated and expended" until the end of "the fiscal year succeeding the fiscal year for which such funds were appropriated ...," 20 U.S.C. § 1225(b), that is, until

September 30, 1982 (the last day of FY1982). It follows that, under optimum conditions, the SEA and its LEAs effectively enjoyed a spread of some twenty-seven months—roughly, July 1, 1980 through September 30, 1982, in our example—within which to obligate a particular year's funds.

One byproduct of this expansion of the obligation period is that, in any fiscal year, an SEA and its LEAs can have available for obligation EHA–B funds from two separate fiscal years, *i.e.*, both current funds and carryover funds (unspent dollars left over from the previous fiscal year). If, despite the enlarged window of opportunity framed by the Tydings Amendment, carryover funds are not thereafter timely obligated and expended within the "Tydings period," they revert to FedEd. *See* 34 C.F.R. § 76.705(b) (1987). "The State shall return to the Federal Government any carryover funds not obligated by the end of the carryover period by the State and its subgrantees." *Id.*

## II. FACTUAL OVERLAY

The material facts, insofar as they are germane to this controversy, are not in dispute. EHA–B funds were allotted by FedEd to MassEd in the ordinary course for FY1979 (October 1, 1978 through September 30, 1979). Under the Tydings Amendment, the operative deadline for obligation and expenditure of such funds was September 30, 1980. Substantially prior to that date, three LEAs—the municipalities of Franklin and Greenfield, and Franklin County—applied for, and received, partial EHA–B funding referable to FY1979. None of the programs were fully funded in the first round of allocations. On September 26, 1980, well over a year after the initial subgrants were made, several other LEAs returned unspent FY1979 EHA–B funds aggregating some $14,053 to MassEd. The procedure which the Commonwealth utilized for reallocation of re-captured funds involved the issuance of so-called "invoice warrants." No warrants purporting to reassign the $14,053 in returned FY1979 funds were prepared, committed, or issued by MassEd during the remaining four days of the Tydings period. Indeed, for some time Massachusetts took no action whatever with respect to these recouped dollars. Nevertheless, after September 30, 1980, despite the expiration of the Tydings period, the Commonwealth did not transfer the money to FedEd. Instead, at various times from October 28, 1980 to November 19, 1980, MassEd directed approximately $13,750 of the excess funds to Franklin, Greenfield, and Franklin County, respectively, by issuing invoice warrants. Inasmuch as these LEAs had been less than fully funded when FY1979 EHA–B subgrants were first doled out,[1] they were able to apply the infusion of carryover funds to (generically allowable) expenditures previously made on approved projects but not theretofore federally reimbursed.

MassEd took the position that, after it recouped the (unused) FY1979 EHA–B funds from other LEAs, such carryover funds could legitimately be used to repay Franklin, Greenfield, and Franklin County for expenses of this genre so long as the three LEAs had initially committed their own (presumably nonfederal) dollars to these items before September 30, 1980. In the Commonwealth's view, it sufficed that the underlying *transactions* had occurred before the cutoff date. Because Massachusetts recorded in its accounting records—albeit in October and November of 1980—that the expenditures would be charged against the recaptured FY1979 funds, that bookkeeping device was enough, it asserted, to classify the funds as "obligated" and "expended" within the Tydings period. This was especially true, MassEd urged, because the "reallocation" of the returned FY1979 funds to Franklin, Greenfield, and Franklin County did not result in any of them receiving *more* federal EHA–B funds

---

**1.** The record does not suggest that any of these three LEAs had received less than a ratable share of the EHA–B funds distributed through MassEd for FY1979. Rather, the total EHA–B dollars originally allotted by the Common-wealth to LEA subgrants referable to that fiscal year was less than the total of approved LEA budgetary requests. Thus, when the funds were initially distributed, no single LEA program was funded 100%.

in school year 1979–1980 than what their approved projects had totalled from the start. *See supra* n. 1.

## III. PROCEDURAL BACKGROUND

In 1984, FedEd scrutinized Massachusetts' handling of these recaptured funds as part and parcel of a broad fiscal review. The audit culminated in the issuance of a letter of determination which concluded that MassEd owed upwards of a quarter-million dollars to the Secretary. Approximately one-half of the amount in controversy, FedEd thought, in one way or another had been obligated beyond the temporal frontiers of the Tydings Amendment—including the FY1979 funds which had been redirected to Franklin, Greenfield, and Franklin County. Far from capitulating to the federal viewpoint, Massachusetts petitioned for administrative review before a panel of the Education Appeals Board ("EAB"). *See* 20 U.S.C. §§ 1234(a), (e), 1234a(b). *See also* 34 C.F.R. § 78.13 (1987).

While the petition was pending, the parties settled most of their differences. The dispute remained zoetic as to the $13,750 of EHA–B funds, more or less, which had been rerouted to Franklin, Greenfield, and Franklin County in the fall of 1980. On October 30, 1986, the EAB decided the point favorably to MassEd, concluding that the sum in question had been obligated and expended consistent with the Tydings Amendment and relevant federal guidelines. EAB decisions are subject to further administrative review. *See* 34 C.F.R. §§ 78.82, 78.83 (1987). The parties submitted initial and responsive comments to the Secretary as contemplated by 34 C.F.R. § 78.82(a), (b), and he thereupon reversed the EAB's decision. *See Appeal of Massachusetts*, Docket No. 37–(169)–84 (Jan. 2, 1987). The Secretary ruled that Massachusetts had improperly reallocated FY1979 EHA–B funds after the Tydings period had run, and that a refund was in order. *Id.* This ruling became FedEd's "final decision" pursuant to 34 C.F.R. § 78.83(d) (1987). The Commonwealth, discontented, filed the instant petition for judicial review.

The principal issue before us involves the correctness of the Secretary's interpretation of the controlling statutes. The parties agree that the Tydings Amendment speaks in the conjunctive. By law, EHA–B funds must be both "obligated" *and* "expended" before the expiration of the Tydings period, or else returned to FedEd. *See supra* Part I. The disputants likewise agree that the amounts in issue were "expended" by the LEAs within the proper time frame (although when actually spent, these were nonfederal dollars). The two sides differ primarily in their ideas as to whether the funds were duly "obligated." They differ, too, as to what must be done— and when—in order for a state to have "obligated" EHA–B monies sufficiently to prevent a reversion from occurring.

The decisive factor is by all accounts one of timing. In the Secretary's view:

> In order for an LEA to have properly obligated FY1979 funds above those to which it was entitled by formula, there would have had to have been a determination to that effect by the SEA *prior* to the close of the Tydings period during which FY1979 funds were available for obligation....

*Appeal of Massachusetts, supra,* at 3 (emphasis in original). The Secretary's prime concern, clearly, was that the reallocation occurred entirely after the close of the Tydings period. Had the new distribution preceded the cutoff date, "the fact that the actual bookkeeping took place after the close of the Tydings period" would not have been a reason for disallowance. *Id.*

MassEd takes an opposite view: it focuses not on the timing of the reallocation, but on the occurrence of the underlying transaction. So long as the expenditure was made by an LEA for a permitted purpose during the Tydings period, the rest is mere paperwork—which can satisfactorily be completed after the fact *and* after the close of the Tydings period.

The battle lines having been drawn, we proceed to an examination of the competing positions.

## IV. THE MERITS

█ We begin by noting that our inquiry is limited in scope. On a petition such as this, we are restricted to the ascertainment of whether, upon inspection of the record as a whole, the Secretary's decision "is supported by substantial evidence and by the application of proper legal standards...." *Bell v. New Jersey*, 461 U.S. 773, 792, 103 S.Ct. 2187, 2198, 76 L.Ed.2d 312 (1983). Because the factual underpinnings of the case are not in dispute, the first part of this test presents clear sailing. The key question which confronts us is whether or not the Secretary applied the "proper legal standard[ ]" in delineating the steps necessary to effectuate obligation of funds during a given interval.

We acknowledge that, in general, Fed-Ed's interpretation of the governing statute is entitled to substantial deference. *E.g., Clarke v. Securities Industry Ass'n,* — U.S. ——, 107 S.Ct. 750, 759–60, 93 L.Ed.2d 757 (1987); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 & n. 14, 104 S.Ct. 2778, 2782 & n. 14, 81 L.Ed.2d 694 (1984); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 689 F.2d 1112, 1117 (1st Cir.1982). Our approach to the question is guided by the Court's teachings:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue, if the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). Moreover, the task of gauging whether the administrative interpretation is "permissible" contemplates "that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer,...." *Id.* at 844, 104 S.Ct. at 2782.

There are, to be sure, limits on this deference: its true measure depends, in the last analysis, on the persuasiveness of the interpretation, given all the attendant circumstances. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Mayburg v. Secretary of Health & Human Services,* 740 F.2d 100, 105–06 (1st Cir.1984); *Citizens Savings Bank v. Bell,* 605 F.Supp. 1033, 1042 (D.R. I.1985). Ordinarily, however, an agency's interpretation will carry the day, unless it is determined to be clearly erroneous or inconsistent with the statutory plan. *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782; *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Cheshire Hospital,* 689 F.2d at 1117. Deference is "particularly appropriate in complex and highly specialized areas where the regulatory net has been intricately woven." *Citizens Savings Bank,* 605 F.Supp. at 1041. *See also Cheshire Hospital,* 689 F.2d at 1117. Then, too, "[m]atters of accounting, unless they be the expression of a whim rather than an exercise of judgment, are for the agency." *Id.* As we have stated before:

> Where Congress is silent, common sense suggests that the less important the question of law, the more interstitial its character, the more closely related it is to the every day administration of the statute and to the agency's administrative or substantive expertise, the less likely it is that Congress wished the court to remain indifferent to the agency's views.

*Constance v. Secretary of Health and Human Services,* 672 F.2d 990, 995–96 (1st Cir.1982). It is against this backdrop that

we must review the Secretary's determination in the instant case.

It is plain that in enacting the Tydings Amendment Congress eschewed a more precise definition of the pivotal phrase "obligated and expended"; to that extent, at least, it chose silence. It is plain that the statutory scheme, overall, is a complicated one, beset with formulaic complexities in its fiscal aspects. It is equally plain that questions anent the recoupment and reallocation of funds are largely matters of accounting, humdrum in nature, prototypically interstitial in their character. Contrary to MassEd's argument, the present controversy does not go to the heart of the EHA-B's goals. Indeed, it does not even hinge on the propriety *vel non* of the reallocation of monies by an SEA among its flock of eligible LEAs. Rather, the focus of the dispute is administrative: the recognition that the parameters limned in the Tydings Amendment must be integrated with the procedures established by the EHA-B in order for a recipient (whether grantee or subgrantee) to obtain and retain "legal authority" to obligate EHA-B funds.

In the first instance, an SEA secures such "legal authority" when it receives a grant from FedEd. 20 U.S.C. § 1411(a). In turn, an LEA's "legal authority" is established when it receives a subgrant from the SEA. 20 U.S.C. § 1411(d). Under the statutory mosaic, "legal authority" to obligate subgranted funds cannot be conferred by one LEA upon another. The funds must be returned by the subgrantee to the SEA—which can transfer them to another LEA only if specific, circumscribed EHA-B reallocation provisions are followed. Congress has provided for such reallocation in but two instances. One of these—20 U.S.C. § 1414(e)—is plainly inapplicable to the situation at bar.[2] The other —20 U.S.C. § 1411(g)(2)—requires each SEA to establish a date by which its flock of LEAs must report the amount of the (previously-allotted) EHA-B subgrants they estimate they will seasonably expend. If the SEA then determines that an LEA will not use part of its EHA-B subgrant during the period of its availability, § 1411(g)(2) permits the state to mandate *pro tanto* cancellation of the subgrant and recapture the excess funds. The SEA may then redistribute such returned funds to other LEAs "which the State Educational Agency determines will need and be able to use additional funds to carry out approved programs." 20 U.S.C. § 1411(g)(2). In short, this statute allows an SEA to reallocate unexpended funds from one LEA to another in the case of any fiscal year in which Congress has failed to appropriate funds sufficient to pay in full the total amount of a state's EHA-B entitlement— but it neither speaks to the timing of such reallocations nor purports to exempt them from the constraints of the Tydings Amendment. In the case of returned funds, as in the case of appropriations initially received by the SEA, the money must be "obligated and expended" within the time frame stipulated by 20 U.S.C. § 1225(b)(1).

The Secretary has interpreted that statute, in a negative vein, to prohibit "retroactive reallocation of unexpended funds from one LEA to another," *Appeal of Massachusetts, supra,* at 3; and in a positive vein, to necessitate a determination specifying and approving a given reallocation of EHA-B funds *"prior* to the close of Tydings period." *Id.* (emphasis in original). Admittedly, MassEd's redistribution of the disputed funds did not comply with these strictures; there would have to have been, at a minimum, a determination by the SEA sufficient to work a reallocation before September 30, 1980 at the latest. There was none.

**2.** Section 1414(e) allows an SEA to reallocate all or part of the EHA-B funds set aside for an LEA which, by dint of other funds (state, local, private, or the like), is successfully providing a free appropriate public education to all handicapped children whom it was created to serve. Under this provision, the set-aside funds can be reallocated to other LEAs which have been unable to provide a free appropriate public education to their constituency, in accordance with the formula contained in 20 U.S.C. § 1411(d). Massachusetts makes no claim that the FY1979 funds here in issue are of this ilk.

In the last analysis, MassEd's position reduces to the claim that requiring a concrete reallocative determination to be made within such inflexible time limits perverts the intent of the statutory scheme. It sees such a tight-fisted interpretation of the Tydings Amendment as both overly parsimonious and flatly wrong. Congress' humanitarian intent, the argument runs, would be more perfectly mirrored by a looser, more liberal construction. We disagree. The Secretary's interpretation of the statute—though perhaps not the only possible reading of it—strikes us as altogether sensible.[3] It certainly comports with the accepted meaning of the verb "obligate" when used in the section 1225(b)(1) sense: "to assign or commit (as funds) to meet a particular obligation." Webster's *Third New International Dictionary* 1556 (1981). Moreover, if the statute were held not to necessitate the making of such an "assign[ment] or commit[ment]" of funds by an SEA to an identified LEA before the September 30 cutoff date, then the requirement that lapsed funds be returned to the federal government, *see, e.g.*, 34 C.F.R. § 76.705 (1987), could be circumvented virtually at will through the device of retroactively reallocating unexpended funds from one LEA to another. Congress could scarcely have meant to cleave so large a loophole in the statute.

The Tydings Amendment was passed in order to facilitate the most comprehensive and efficient use of EHA–B funds by state and local educational agencies. *See* 116 Cong.Rec. 2470–71 (1970) (remarks of Sen. Tydings). Congress deliberately avoided dispensing EHA–B funds to the states on a "no-strings-attached" basis. EHA–B involves federal programmatic guidelines, federal restrictions on the use of funds, and a series of federally imposed time constraints. The Tydings Amendment eased—but did not eliminate—these constraints. While we agree with petitioner that the legislation was not a federal "deficit reduction" measure, we are equally confident that it was not intended to relieve grantees or subgrantees from the requirement of adhering to explicit temporal deadlines imposed by the Congress. As the House Report stated: "(A)doption [of the Tydings Amendment] ... is not meant to encourage the States, in any way, to avoid carrying out Federal legislative requirements...." H.R.Rep. No. 95–1137, 95 Cong., 2d Sess. 139, *reprinted in* 1978 U.S.Code Cong. & Admin.News 4971, 5109.

Given the continuing federal oversight which characterizes the EHA–B generally, and the unmistakable refrain of the Tydings Amendment that funds "not obligated and expended" within the delimited time, 20 U.S.C. § 1225(b)(1), escheat to FedEd, the Secretary's interpretation appears to be a very plausible one. Requiring an SEA to earmark EHA–B funds within the Tydings period—that is, to determine and identify the particular subgrantee which will enjoy the benefit of a given EHA–B dollar before the Tydings deadline turns the state's coach back into a federal pumpkin—seems not only reasonable, but entirely consistent with, and supportive of, the statutory plan. The interpretative choice which FedEd has made is "sufficiently rational to preclude a court from substituting its judgment for that of the [agency]." *Young v. Community Nutrition Institute*, 476 U.S. 974, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959 (1986). Accordingly, deference to the Secretary's views appears appropriate. *See id. See also Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985) (to sustain agency's view, court "need not find that it is the only permissible construction that [agency] might have adopted, but only that [agency's] understanding" of complex statute is a "rational one"); *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782 (similar). *Cf. Donovan v. A. Amorello & Sons, Inc.*, 761 F.2d 61, 63–64 (1st Cir.1985) ("[I]n deciding what is reasonable, courts must take account of the agency's likely greater knowledge of

---

**3.** The Secretary has dealt by regulation with how and when "obligations" for some kinds of property and services become binding. 34 C.F.R. § 76.707 (1987). This regulation is neither applicable to, nor of material assistance in, the resolution of the issue which confronts us in this case.

the rule's intended purpose and the agency's practical understanding of how competing interpretations may affect the agency's regulatory mission.").

■ Petitioner advances two additional reasons, however, why its reading of the Tydings Amendment, giving a less restrictive nuance to the phrase "obligated and expended," is to be preferred. The first of these centers around the fact that MassEd did not learn until a mere four days before the end of the Tydings period that the original recipients would be unable to use the funds. Thus, the Commonwealth argues, it is unfair and unrealistic to expect the reallocation machinery to operate on such short notice. By effectively foreclosing in-state use of the funds in this fashion, it is said, the Secretary's construction of section 1225(b)(1) trammels the basic objective of the Tydings Amendment, which "was enacted to encourage maximal and efficient use of EHA funds by state and local educational agencies ... giv[ing] grant recipients sufficient time to make productive and meaningful use of the funds appropriated...." Petitioner's Brief at 13–14 (citations omitted). The short answer to this plaint is that it was Massachusetts—not the federal government—which created the time bind. An SEA has the power—perhaps, one might argue, the duty —to impose reasonable "use-or-lose" restrictions on its LEAs. Had MassEd followed this route, it could have assured itself of appropriate lead time with respect to funds not needed by particular LEAS.[4] If by the Secretary's interpretation of section 1225(b)(1) Massachusetts has been hoist at all, it has been hoist with its own petard.

Petitioner's next "reason" smacks of the functional equivalent of administrative *stare decisis*. It envisions that the Secretary, in finding the funds not "obligated" within the Tydings period, impermissibly countermanded his previous decision in *Appeal of California*, Docket No. 12–(122)–83 (May 6, 1986). We recognize that when an agency fills a quasi-judicial role, it builds a body of precedent which it cannot thereafter lightly disregard. Like courts, agencies "have an obligation to render consistent opinions and to either follow, distinguish, or overrule" their own earlier pronouncements. *Chisholm v. Defense Logistics Agency*, 656 F.2d 42, 47 (3d Cir.1981). But in our estimation, the Secretary honored the rule on this occasion and appropriately distinguished the two matters.

The earlier case arose because California's use of a first-in, first-out method of accounting ("FIFO") for. EHA–B funds meant that obligations undertaken within the Tydings period could not be recorded properly until after that period had closed. In light of this accounting protocol, the Secretary held that "an obligation may be debited to a specific source of funds after the close of the Tydings period *so long as* there is *clear* and *unambiguous* documentation showing that the transaction giving rise to the obligation occurred before the relevant Tydings cutoff date." *Appeal of California, supra*, at 5 (emphasis in original). Massachusetts, which also uses a FIFO accounting method, would read "transaction" in this sense merely to mean that the funds had been *expended* (by the LEA) before the cutoff date. But, the context does not support so sweeping a reading.

*Appeal of California* did not concern the surrender of EHA–B dollars by a funded LEA and the subsequent (post-Tydings period) reallocation of those dollars among other (competing) LEAs. Rather, *California* dealt with the tabulation of funds *within a single LEA*. In fine, there was no question of which agency would receive the funds; the only question was which monies

---

**4.** It seems, for example, well within an SEA's power to make subgrants contingent upon the express condition that the recipient LEA obligate and expend the funds no later than, say, sixty days before the expiration of the applicable Tydings period, or prove to the state that they will be duly obligated and expended before the cutoff date. *See* 34 C.F.R. § 76.772(a)(4); *see* also 34 C.F.R. §§ 76.580, 76.581 (state responsible for coordination among subgrantees, *inter alia*, to maximize beneficial impact of distribution of funds). If MassEd had attached such a string to its subgrants, it would have had a correspondingly longer interval within which comfortably to perfect an acceptable reallocation.

should be debited against which expenditures. By allowing the bookkeeping entries to follow the expiration of the Tydings period, FedEd allowed a *funded* LEA greater latitude to credit its earliest approved expenditures against its oldest EHA–B grants.[5]

In the present case, Massachusetts did not merely engage in post-Tydings recordkeeping. It actually transferred funds between LEAs—and it did so *after* the period prescribed by law for engaging in such transactions. As opposed to matching up actual expenditures with previously allotted monies, MassEd sought belatedly to add money to the LEAs' pots after the deadline for awarding and funding subgrants had elapsed. As the Secretary observed:

> It would be an impermissible extension of the holding in [*Appeal of California* ] to conclude that a State may authorize the reallocation of excess funds between different subgrantees after the time has expired for such subgrantees to obligate such funds. Such a reallocation would effectively permit an increase in a given fiscal year's available funds after the point at which such funds had lapsed.

*Appeal of Massachusetts,* Docket No. 37–(169)–84, at 3.

We are conscious that an administrative agency must be given wide latitude in deciphering its own opinions. As the District of Columbia Circuit has recently observed, there is a "high level of deference to be afforded an agency on review when the issue turns on the interpretation of the agency's own prior proclamations." *Wichita and Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 778 (D.C.Cir.1986). In the present instance, we believe that the Secretary acted reasonably in distinguishing this case, involving a post-Tydings transfer of funds from one group of LEAs to another, from an earlier decision of the agency in a case involving no more than the belated identification of the source of particular funds.

■ In a last-ditch effort to avert the inevitable, MassEd contends that the grounds upon which the Secretary's final decision rested had not been raised during the earlier stages of the administrative proceedings. This irregularity, petitioner says, deprived the Commonwealth of its right to a meaningful hearing under 20 U.S.C. § 1234a(a), (b) (requiring notice of the basis on which expenditures are challenged). MassEd suggests that this shortcoming can be remedied only by a remand for the taking of additional evidence. The argument, we think, misperceives the nature of the fulcrum upon which the Secretary's final decision pivoted.

There is nothing in the record to indicate either that Massachusetts was deprived of a fair hearing or that any further (relevant) evidence exists which could have been presented in the administrative forum. The issue upon which the Secretary's decision turned—the Commonwealth's compliance with the timing requirements of the EHA–B and the Tydings Amendment—was thoroughly ventilated before the EAB and in the comments submitted by the opposing parties to the Secretary. MassEd acknowledges that it took no action to redistribute the returned FY1979 funds before the critical date passed. It concedes that it neglected to earmark them for the use of Franklin, Greenfield, and Franklin County until well after September 30, 1980. By the time meaningful steps were taken, the Tydings period was history. Simply put, there was no timely compliance with the reallocation provisions of the controlling statutes. That being so, the funds were forfeit as a matter of law. No amount of further evidence would alter or recast those basic (uncontroverted) facts. So, remand would serve no useful purpose. Af-

---

**5.** It is not without significance that, in so deciding, the Secretary acknowledged that Congress' enactment of the Tydings Amendment signalled a desire "to ensure that all of a given year's appropriation ultimately got spent by [LEAs]." *Appeal of California, supra,* at 4. Yet, in words which accurately presaged his final decision in the present case, the Secretary warned that "Congress' purpose could only be served if the ultimate incentive for a local agency to obligate funds continued to have force, namely reversion to the Federal treasury of unexpended funds." *Id.*

ter all, a silk purse cannot be embroidered from a sow's ear.

The Commonwealth's failure to meet the imperatives of § 1225(b)(1), as interpreted by the Secretary, is fatal to its case. Congress having taken particular pains to outline a pair of avenues for reallocation, and having entrusted administration and oversight of the EHA–B to FedEd, we decline to imply any more general grant of "legal authority" for the commitment of federal funds. The $13,750 in controversy was not "obligated" within the Tydings period and was properly subject to escheat.

## V. CONCLUSION

The hairpin curves through the statutory labyrinth, we think, have been appropriately negotiated by the Secretary in this instance. He could perhaps have chosen another route—but he was not obliged to do so. For the reasons which we have discussed, we find FedEd's interpretation of the statutory language to be supportable and the ensuing ruling to rest upon substantial evidence in the record. Here, as in *Young*, 106 S.Ct. at 2365, it is "sensible" to afford the agency reasonable latitude in deciphering and administering the details of the statutory arrangement.

We need go no further. The Secretary's final decision does not appear to us to have been reached arbitrarily, capriciously, or under any discernible misapprehension of law. Accordingly, the review petition must be denied and dismissed, and the agency's determination

*Affirmed.*