UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1254

CHRISTINE STOWELL, ET AL.,
Plaintiffs, Appellants,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,
Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Selya, Cyr and Boudin, Circuit Judges.

Patrick Ende, with whom Jack Comart and Pine Tree Legal

Assistance were on brief, for appellants.

Robin S. Rosenbaum, Attorney, Civil Division, U.S.

Department of Justice, with whom Stuart Schiffer, Acting

Assistant Attorney General, Jay P. McCloskey, United States

Attorney, and Barbara C. Biddle, Attorney, U.S. Department of

Justice, were on brief, for appellee.
Christopher C. Leighton, Deputy Attorney General, with whom

Michael E. Carpenter, Attorney General, and Thomas D. Warren,

Deputy Attorney General, were on brief for State of Maine, amicus
curiae.

September 10, 1993

SELYA, Circuit Judge. Although this appeal presents an
SELYA, Circuit Judge.

issue of first impression that requires us to navigate a complex

maze of statutes and regulations, its resolution turns on the

interpretation of two words in common usage. We hold, as did the

court below, that the Secretary of Health and Human Services (the

Secretary) permissibly concluded that the term "payment levels"

as used in 42 U.S.C. 1396a(c)(1) (1988) refers to baseline

payments received under the Aid to Families with Dependent

Children (AFDC) program. Consequently, we affirm.

I. BACKGROUND

AFDC is a voluntary, cooperative federal-state social

service program paid for by both sovereigns but administered

largely by the states. See 42 U.S.C. 601-615 (1988 & Supp.

III 1991); see also Doucette v. Ives, 947 F.2d 21, 23-24 (1st

Cir. 1991) (describing interactive nature of AFDC program). For

heuristic purposes, we limit our discussion of this intricate

program to the particular problem around which this case

revolves.

Through AFDC, poor families receive a monthly stipend

(the basic AFDC grant). The amount of the stipend varies from

state to state and also varies according to family size. If a

family unit has some other income, say, child support payments,

most states deem this money to offset the guaranteed AFDC stipend

pro tanto. Under such a regime, a dollar is subtracted from the

family's basic AFDC grant for every dollar of supplemental income

received. See, e.g., Hassan v. Bradley, 818 F. Supp. 1174, 1176

2

& n.4 (N.D. Ill. 1993) (describing methodology and identifying

states which employ it).

A few states, Maine among them, take a less

conventional approach to supplemental income. Up to a point,

Maine permits a family to receive such income without offsetting

it against the basic AFDC grant. Only when the family's

aggregate income reaches a designated level a level that Maine

calls the "standard of need" does Maine begin to shrink the

basic AFDC grant in proportion to the marginal amount of

supplemental income received. In the bureaucratic idiom, this

phenomenon is known as "gap filling" because no offsets are made

until the family's supplemental income has filled the gap between

the stipendiary amount of the basic AFDC grant and the (somewhat

higher) standard-of-need amount. Even then, the offset is

limited to the excess of familial receipts over the standard of

need. See Doucette, 947 F.2d at 23-24.

In 1991, Maine, faced with burgeoning budgetary woes,

narrowed this gap by upgrading basic AFDC grants while

simultaneously downgrading standards of need. This revision took

effect on April 1, 1992 (after the district court lifted a

temporary stay). As a result, AFDC-eligible families with

relatively high amounts of supplemental income receive lower

payments than before and families with little or no supplemental

income receive higher payments than before. More specifically,

because child support payments are collected by the state and

then transmitted to AFDC recipients as supplemental income, see

3

42 U.S.C. 602(a)(2) (1988), Maine's reduction in the standard

of need meant that certain AFDC-eligible families would receive

lower overall payments from the state than they would have

received prior to May 1, 1988.1 After the changes became

effective, the Secretary continued to authorize Medicaid funding

for Maine.

Although the revisions did not ruffle federal feathers,

they prompted the instant suit. Seeking declaratory and

injunctive relief, 5 U.S.C. 702 (1988), plaintiff-appellant

Christine Stowell accused the Secretary of violating a

maintenance-of-effort provision contained in the Medicare

Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, 102 Stat.

683.2 That provision, codified at 42 U.S.C. 1396a(c)(1)

1A concrete example may help to illuminate the effect of the
revisions. On May 1, 1988, a single mother with two dependent
children would have received a basic AFDC grant of $416. Had the
family unit also received $157 in child support payments, it
would have retained the entire amount ($573 per month). While
Maine's revisions boosted the same family's basic AFDC grant to
$453 per month, the concomitant lowering of the standard of need,
given the assumptions in our hypothetical, would have required an
offset of all supplemental income over $100 per month, or $57.
The net effect, then, would have been to cap the family's total
monthly receipts at $553 ($20 per month less than the family
would have retained under the earlier regime). On the other
hand, if our hypothetical family had no supplemental income, the
revisions would have increased its receipts by $37 per month (the
amount by which Maine hiked the basic AFDC grant).

In constructing this example, we have excluded any
reference to the $50 "pass-through" payment described in 42
U.S.C. 657(b)(1) (1988), which was unaffected by the revisions
in question.

2Stowell also attempted to sue the state. That suit has
gone by the boards as a result of our holding that the
maintenance-of-effort provision imposed a duty only on the
Secretary. See Stowell v. Ives, 976 F.2d 65, 71 (1st Cir. 1992).

4

(1988), directs the Secretary not to approve any state's Medicaid

plan if the state's AFDC program sets "payment levels" lower than

those in effect on May 1, 1988. Refined to bare essence,

Stowell's position has consistently been that the maintenance-of-

effort provision prohibits the Secretary from approving state

Medicaid plans if the state's AFDC payment levels are lower than

those in effect on May 1, 1988; that the total amount of money

Stowell and persons similarly situated currently receive from

Maine is lower than the amount they would have received under the

earlier (pre-May 1, 1988) rules; that, nonetheless, the Secretary

did not refuse to fund Maine's Medicaid plan; and that,

therefore, the Secretary violated the maintenance-of-effort

provision.

The case proceeded as a class action3 and the parties

submitted it on a stipulated record. The district court asked a

magistrate judge for a report and recommendation. Reasoning that

Maine had not, in fact, reduced its payment levels below those in

3The plaintiff class comprises:

All families in the State of Maine who would
be eligible for AFDC benefits and/or
supplemental payments under 42 U.S.C
602(a)(28) [providing for payment of child
support collected by the state] under the
AFDC payment levels in effect in Maine on May
1, 1988 and who would receive a smaller total
AFDC plus supplemental 602(a)(28) payment
under the AFDC payment levels proposed to be
effective April 1, 1992 than they would have
received under the May 1, 1988 payment
levels.

Stowell v. Sullivan, 812 F. Supp. 264, 266 n.3 (D. Me. 1993).

5

effect on May 1, 1988, the magistrate recommended that the court

enter judgment for the Secretary. See Stowell v. Sullivan, 812

F. Supp. 264, 266-71 (D. Me. 1993) (reproducing magistrate's

report). On de novo review, the court adopted the

recommendation. See id. at 265-66. Plaintiffs appeal.

II. ANALYSIS

The issue is whether the Secretary's continued funding

of Maine's Medicaid plan, despite the state's decision to lower

its standard of need, violates the maintenance-of-effort

provision.4 We have repeatedly urged that, when a nisi prius

court handles a matter appropriately and articulates a sound

basis for its ruling, "a reviewing tribunal should hesitate to

wax longiloquent simply to hear its own words resonate." In re

San Juan Dupont Plaza Hotel Fire Litig., 989 F.2d 36, 38 (1st

Cir. 1993). Because we are in substantial agreement with

Magistrate Judge Cohen's thoughtful disquisition, see Stowell v.

Sullivan, 812 F. Supp. at 266-71, we invoke this principle and

confine ourselves to a few decurtate observations.

First: Whenever a court is charged with statutory
First:

interpretation, the text of the statute must be its starting

point. See Estate of Cowart v. Nicklos Drilling Co., 112 S. Ct.

2589, 2594 (1992). Here, however, the statutory language does

4The Secretary also argues that, even if the term "payment
levels" is given the expansive reading that appellants suggest,
the federal government's obligation to intervene would not arise
unless and until Maine sought approval of amendments to its
Medicaid plan. We need not consider this contention and,
consequently, take no view of it.

6

not directly answer the question posed. It provides that:

the Secretary shall not approve any State
plan for medical assistance if

(1) The State has in effect, under
its [AFDC plan], payment levels
that are less than the payment
levels in effect under such plan on
May 1, 1988.

42 U.S.C. 1396a(c)(1). The term "payment levels," which is not

defined elsewhere in the statute, could, as the Secretary claims,

refer to the stipendiary amounts of basic AFDC grants; it could

also, as appellants claim, refer to total income, that is, grant

amounts plus supplemental income actually received. Given two

plausible alternatives, and recognizing that the universe of

interpretive possibilities may extend beyond them, we think the

statute contains an undeniable ambiguity.

Appellants resist this conclusion. Pointing out that,

in certain other contexts, Congress referred to the basic AFDC

grant as the "payment standard," 42 U.S.C. 602(h) (1988), they

argue that the term "payment levels" must mean something else.

This argument founders. It is apodictic that Congress may choose

to give a single phrase different meanings in different parts of

the same statute. See Atlantic Cleaners & Dyers, Inc. v. United

States, 286 U.S. 427, 433 (1932); Greenwood Trust Co. v.

Massachusetts, 971 F.2d 818, 830 n.10 (1st Cir. 1992), cert.

denied, 113 S. Ct. 974 (1993). It is a natural corollary of this

truism that Congress, in its wisdom, may choose to express the

same idea in many different ways. Cf., e.g., Cowart, 112 S. Ct.

at 2596 (stating that Congress's eschewal of a term of art used

7

elsewhere in the same statute, in favor of a more descriptive

term, does not necessarily mean that the two terms bear different

meanings). Any other interpretive rule would defy human nature

and ignore common practice. Courts should go very slowly in

assigning talismanic importance to particular words or phrases

absent some cogent evidence of legislative intent.

Second: Appellants' attempt to score a touchdown by a
Second:

selective perusal of legislative history puts no points on the

board. The centerpiece of this effort is a passage evincing a

congressional purpose "to assure that the resources [for

Medicaid-related coverage of certain persons] are not diverted

from the [AFDC] program." House Conf. Rep. No. 661, 100th Cong.,

2d Sess. 145, 256, reprinted in 1988 U.S.C.C.A.N. 923, 1034. But

this language does not help to resolve the statute's linguistic

ambiguity in appellants' favor.

For one thing, the passage, like the statute itself,

leaves unaddressed the question whether Congress's underlying

concern lay with all payments affecting the AFDC program or only

with the stipendiary amounts of basic AFDC grants and an

ambiguous statute cannot be demystified by resort to equally

ambiguous legislative history. For another thing, to the extent,

if at all, that the quoted passage indicates a broad

congressional purpose to provide AFDC recipients with a fixed

safety net, we think it cuts against appellants' construction of

the term "payment levels." Because supplemental income is

contingent on a nearly infinite variety of circumstances,

8

appellants' definition would at most guarantee AFDC recipients a

hypothetical sum; the Secretary's reading, on the other hand,

secures a fixed payment floor.

The sockdolager is that the quoted passage, read in

context, is counteracted by other items in the legislative

history, including those that stress the importance of continued

flexibility. Congress prized flexibility because it "allows each

state to establish its own need and payment standards for

assistance." S. Rep. No. 377, 100th Cong., 2d Sess. 1, 49,

reprinted in 1988 U.S.C.C.A.N. 2776, 2826. Certainly, the

Secretary's rendition of "payment levels" enhances a state's

flexibility while appellants' version detracts from it. See

infra pp. 13-14. This jousting between archival excerpts drives

home the point that "reviewing legislative history is like

looking over the crowd at a party and picking out one's friends."

Patricia J. Wald, Some Observations on the Use of Legislative

History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 214

(1983) (quoting Leventhal, J.). In this instance, both sides

have unearthed congenial acquaintances. The net result, however,

is that evidence gleaned from the legislative history does not

tell a straightforward tale and, therefore, does not resolve the

ambiguity with which we are concerned.5

5By discussing the House Conference Report excerpt, we do
not mean to imply that Maine has diverted resources from the AFDC
program to the Medicaid program. There is no such evidence in
the record. Thus, appellants' reading of the legislative
history, even if we were to credit it, would not necessarily
carry the day. See, e.g., Babbitt v. Michigan, 778 F. Supp. 941,

947 (W.D. Mich. 1991).

9

Third: When a statute is silent with respect to a
Third:

specific question, courts frequently afford deference to a

plausible construction offered by the agency charged with

administering it. See National R.R. Passenger Corp. v. Boston &

Me. Corp., 112 S. Ct. 1394, 1401 (1992) (stating that "[i]f the

agency interpretation is not in conflict with the plain language

of the statute, deference is due"); Chevron U.S.A., Inc. v. NRDC,

Inc., 467 U.S. 837, 843 (1984); Massachusetts Dep't of Educ. v.

United States Dep't of Educ., 837 F.2d 536, 541 (1st Cir. 1988).

Here, the agency that the Secretary heads, the Department of

Health and Human Services (HHS), is entrusted with administering

both the Medicaid and AFDC statutes. Since HHS interprets the

maintenance-of-effort provision to refer only to the basic AFDC

grant, Chevron principles pose a formidable barrier in

appellants' path.

In an endeavor to skirt this barrier, appellants

suggest that deference would be inappropriate here because HHS

has not maintained a consistent position. The suggestion is

factually unfounded and legally unpersuasive.

We begin by examining the facts. Although the agency's

position has shifted in some respects over the years, it has not

waffled with regard to the meaning of "payment levels." HHS's

first public elucidation of the point appears in a 1989

publication informing state officials that "if you make

adjustments to your [AFDC] payment levels which do not result in

lower payment amounts being made to families with no countable

10

income, you are considered to meet the Medicaid Maintenance of

Effort Requirements." State Medicaid Manual 3205 (May 1989).

In subsequent commentaries, HHS made plain that this reference

was intended to include only those families which received no

income over and above the basic AFDC grant. We see no

inconsistency between this original interpretation, roughly

contemporaneous with the statute's enactment, and the agency's

current views.

Appellants' legal theory rests on an equally shaky

foundation. Agencies "must be given ample latitude to adapt

[their] rules and policies to the demands of changing

circumstances." Rust v. Sullivan, 111 S. Ct. 1759, 1769 (1991)

(citations and internal quotation marks omitted). An important

corollary of this rule is that an agency's position may evolve

over a period of time without automatically forfeiting all claims

to judicial deference. And, moreover, an agency interpretation

that represents a modification of, or even a sharp departure

from, a prior interpretation does not necessarily eliminate the

expertise-related reasons for judicial deference. See id.;

Chevron, 467 U.S. at 862-64. Thus, an explained modification of

an agency interpretation ordinarily retains its entitlement to

whatever deference may be due. See Rust, 111 S. Ct. at 1769

(collecting cases). So it is here.6

6To be sure, in this case the agency claims that its
position has been consistent throughout. It is too much to
expect that even bureaucrats a species renowned for mastery of
the fissilingual can explicate the reasons underlying a change
that was never made. Regardless, HHS has explained, cogently and

11

Next, appellants try to skirt the Chevron barrier by

taking a different path. They asseverate that HHS's view merits

little deference because determining this particular statute's

meaning involves primarily judicial, as opposed to

administrative, skills. The attempted end run fails.

The Chevron doctrine often requires different degrees

of deference in different situations. See Sierra Club v. Larson,

F.2d , (1st Cir. 1993) [No. 92-2227, slip op. at 17-

18]. Although the need for deference diminishes as issues become

more law-bound and less moored to administrative expertise, see,

e.g., United States v. 29 Cartons of * * * an Article of Food,

987 F.2d 33, 38 (1st Cir. 1993) (collecting cases), this case is

not removed from the realm of specialized administrative

knowledge. When Congress commanded the Secretary to ensure that

"payment levels" were maintained, it left open the question of

how that term might be defined in a manner that would best

promote efficient, fair administration of two complicated social

service programs. The agency, in filling this lacuna, relied on

its lengthy experience with the statutes involved. See AFDC

Information Memorandum (August 5, 1992). Courts should not

cavalierly discount the value of agency expertise painstakingly

garnered in the administration, over time, of programs of

remarkable intricacy. See, e.g., La Casa Del Convaleciente v.

in detail, why it believes its current interpretation of the
ambiguous phrase is sound. No more is exigible. See Rust, 111

S. Ct. at 1769; Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 42 (1983).

12

Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992) (suggesting that

deference to agency expertise is particularly appropriate in the

complex field of Medicare); Wilcox v. Ives, 864 F.2d 915, 926-27

(1st Cir. 1988) (Breyer, J., concurring) (suggesting that

deference is appropriate where an agency has, through its daily

experience in administering a statute, gained a firm

understanding of the relation of a given provision to the statute

as a whole); see also Friedman v. Berger, 547 F.2d 724, 727 n.7

(2d Cir. 1976) (Friendly, J.) (stating that the Social Security

Act, of which AFDC and Medicaid are a part, is "almost

unintelligible to the uninitiated"), cert. denied, 430 U.S. 984

(1977).

Fourth: Our last point is, in actuality, a subset of
Fourth:

our third point. In this instance, reading the phrase "payment

levels" as encompassing only the stipendiary amounts of basic

AFDC grants preserves the program's flexibility and facilitates

its administration. Hence, the cardinal reason why deference is

due is because the agency's interpretation of the disputed term

is not only linguistically plausible but also eminently sensible.

See 29 Cartons, 987 F.2d at 38 (explaining that the true measure

of a court's willingness to defer may depend, in the final

analysis, on the persuasiveness of the agency's interpretation,

given all the attendant circumstances); Mass. Dep't of Educ., 837

F.2d at 541 (similar).

States have traditionally been afforded a broad measure

of discretion in implementing the AFDC program. See Jefferson v.

13

Hackney, 406 U.S. 535, 539-41 (1972). The murky language of 42

U.S.C. 1396a(c)(1) cannot readily be interpreted as a signal

that Congress meant to scrap this tradition. Cf., e.g., Rosado

v. Wyman, 397 U.S. 397, 414 n.17 (1970) ("An extensive alteration

in the basic underlying structure of an established program is

not to be inferred from ambiguous language that is not clarified

by legislative history."). Appellants' construction that the

maintenance-of-effort provision is triggered whenever any family

unit receives fewer total dollars in a given month than it would

have received that month under the set of computational rules

that were in effect on May 1, 1988 runs at cross purposes to

this deep-seated discretion by inhibiting a state's ability to

reorder its priorities. For example, reading the term "payment

levels" as appellants prefer would preclude a state from

distributing AFDC funds according to a new formula, although the

state maintained (or, perhaps, even increased) its aggregate AFDC

expenditures.7 In contrast, interpreting the term "payment

levels" as referring only to basic AFDC grants, as the Secretary

urges, provides all recipients a protective floor while still

permitting states to implement changes that more efficiently

allocate scarce resources. There is every reason to believe that

this latter route, which preserves the discretion traditionally

7The case at bar illustrates the point. Although Maine
reduced the amount of outside income a person may receive before
AFDC payments will be offset partially to save money, it also had
another purpose: increasing the benefits available to more needy
AFDC recipients, i.e., those who receive basic AFDC grants but

have little or no supplemental income.

14

available to the states in implementing the AFDC program and

maximizes state flexibility, is a far closer approximation of

congressional intent. See S. Rep. No. 377, 100th Cong., 2d Sess.

49, reprinted in 1988 U.S.C.C.A.N. 2776, 2826 (referring to the

incidence of state flexibility in connection with need and

payment standards).

Nor is this the only straw in the interpretive breeze.

We can safely assume that Congress, in enacting the statute,

preferred administrative efficiency to administrative clutter.

See Dion v. Commissioner, Me. Dep't of Human Servs., 933 F.2d 13,

17 (1st Cir. 1991) (discussing congressional interest in an

administratively streamlined procedure for food stamp

recipients). This, too, cuts in favor of the Secretary for the

Secretary's interpretation is administratively more workable than

appellants' interpretation. If the term "payment levels" means

basic AFDC grant amounts, both state and federal administrators

can tell quite easily whether a proposed change in a state's plan

activates the maintenance-of-effort provision. If, on the other

hand, the term means all payments made to all AFDC recipients, it

prescribes a much more complicated, highly individualized

calculation. Because the Secretary's reading of the statute

ensures that a significant portion of the finite funds available

for AFDC and Medicaid go to needy recipients rather than to the

costs of administrative implementation, it jibes more neatly with

Congress's likely intent.

III. CONCLUSION

15

We need go no further.8 When, as now, the case is

debatable, the key phrase in the statute is patently ambiguous,

the legislative history is unilluminating, the subject matter is

somewhat technical, and the indications are that Congress wanted

to take advantage of agency expertise, a plausible interpretation

of the disputed term, expressed with clarity by the agency

charged with the statute's administration, necessarily carries

great weight. To clinch matters, the agency's interpretation of

the phrase "payment levels" in the statute sub judice also helps

to maintain traditional programmatic goals and to promote the

public interest in efficient implementation of the affected

programs. We hold, therefore, consistent with the Secretary's

view, that the allusion in 42 U.S.C. 1396a(c)(1) to "payment

levels" refers only to the stipendiary amounts of basic AFDC

grants and not, as appellants have argued, to total monies

actually received by each AFDC family. Accordingly, the judgment

below will be

Affirmed.

8We do not tarry over appellants' assertion that
administrative interpretations and statutory provisions in other
fields treat certain supplemental income in the same fashion as
basic AFDC grants. In the first place, these interpretations,
all of which deal with program administration, are analytically
distinct and, therefore, inapposite. See Stowell v. Sullivan,

812 F. Supp. at 270-71 (discussing identical proffer). In the
second place, this is a zero-sum game; the Secretary has produced
a counter-list of interpretations and provisions which treat
supplemental income and basic AFDC grants differently. Compare,

e.g., 51 Fed. Reg. 29,223, 29,224 (1986) (declaring supplemental

payments to be AFDC expenditures for purposes of matching federal
funds) with, e.g., Winslow v. Commissioner, Me. Dept. of Human

Servs., 795 F. Supp. 47, 49-50 (D. Me. 1992) (upholding

Secretary's determination that supplemental payments are not AFDC
payments for purposes of computing Medicaid income levels).

16